307 P.3d 40

**In re the Marriage of Stephen John NASH, Petitioner/Appellee,**

v.

**Alejandra Amarilla NASH, Respondent/Appellant.**

Nos. 1 CA–CV 12–0039, 1 CA–CV 12–0076, 1 CA–CV 12–0077.

Court of Appeals of Arizona, Division 1, Department C.

July 23, 2013.

By Eileen Dennis GilBride, Phoenix, Attorneys for Respondent/Appellant.

## OPINION

JOHNSEN, Chief Judge.

¶ 1 This is an appeal from a child-support order entered in the dissolution of a marriage of two persons of considerable wealth. We hold the superior court in such a case may not limit child support to an amount required to meet the children's minimal needs. To the contrary, child support should permit the children of such a marriage to continue to enjoy the reasonable benefits they had while their parents were married. Because the superior court did not apply this principle, we vacate and remand its child-support order. Addressing two post-decree orders also at issue on appeal, we affirm an order prohibiting the parents from posting disparaging remarks about each other on social media, but vacate a *sua sponte* order barring the parents from disclosing any document or information in any document filed in the proceeding.[1]

## FACTS AND PROCEDURAL HISTORY

¶ 2 Stephen John Nash ("Father") and Alejandra Amarilla Nash ("Mother") married in 2005. In 2010, when Father filed for dissolution, the parties had an infant son and two six-year-old daughters. Although the parties resolved issues of custody and parenting time by agreement, they could not agree on child support, and the superior court held a one-day trial on the issue.

¶ 3 The parties jointly asked the court to close the trial to the public, and it did so. Shortly after the court issued its judgment and decree, it reiterated a prior *sua sponte* order that sealed all proceedings and *sua sponte* ordered that "[d]ocuments, records, and transcripts sealed by the Court, and information contained in the sealed material, may *not* be disseminated to any third party without an Order of the Court." The court also affirmed a parenting coordinator's report that rebuked Mother for "tweeting" a

Dickinson Wright/Mariscal Weeks PLLC By Robert L. Schwartz, Steven D. Wolfson, Anne L. Tiffen, Phoenix, Attorneys for Petitioner/Appellee.

Hallier & Lawrence, PLC By Angela K. Hallier and Jones, Skelton & Hochuli, P.L.C.

---

1. In a separate memorandum decision, we address another issue arising out of the decree.

*See* ARCAP 28(g).

negative remark about Father and declared that she "must stop" using social media to disparage him.

¶ 4 We consolidated Mother's timely appeals of the decree and the post-trial orders. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1) (West 2013) and –2101(A)(1), (2) (West 2013).[2]

## DISCUSSION

### A. Child Support.

#### 1. Legal principles.

 ¶ 5 "[W]e will not disturb a court's award of child support absent an abuse of discretion." *Hetherington v. Hetherington,* 220 Ariz. 16, 21, ¶ 21, 202 P.3d 481, 486 (App.2008). We will accept the court's findings of fact unless they are clearly erroneous, but we draw our own legal conclusions from facts found or implied in the judgment. *McNutt v. McNutt,* 203 Ariz. 28, 30, ¶ 6, 49 P.3d 300, 302 (App.2002).

¶ 6 Pursuant to A.R.S. § 25–320(A) (West 2013), the superior court "may order either or both parents owing a duty of support to a child ... to pay an amount reasonable and necessary for support of the child." In subpart (D) of the same statute, the legislature directed the supreme court to "establish guidelines for determining the amount of child support." A.R.S. § 25–320(D). The result is the Arizona Child Support Guidelines ("Guidelines"), Appendix to A.R.S. § 25–320 (West 2013). *Id.* "The amount resulting from the application of [the] guidelines is the amount of child support ordered unless a written finding is made, based on criteria approved by the supreme court, that application of the guidelines would be inappropriate or unjust in a particular case." A.R.S. § 25–320(D).

¶ 7 The Guidelines establish a framework for determining the amount of child support

"consistent with the reasonable needs of children and the ability of parents to pay." Guidelines, § 1. The premise of the Guidelines is the Income Shares Model, which itself is based on two principles: (1) "The total child support amount approximates the amount that would have been spent on the children if the parents and children were living together," and (2) "Each parent contributes his/her proportionate share of the total child support amount." *Id.,* Background.

¶ 8 Attached to the Guidelines is a "Schedule of Basic Support Obligation" ("Schedule"), which sets out presumptive amounts of child support, called the "Basic Child Support Obligation," derived from the parents' combined gross incomes.[3] As the parents' combined gross income increases, so does the presumptive Basic Child Support Obligation. The highest combined income in the Schedule is $20,000 per month. If the parents' combined gross income exceeds $20,000 per month, the presumptive Basic Child Support Obligation is that identified for a combined income of $20,000 per month. *Id.* §§ 2(G)(2), 8. A parent may request an "upward deviation" from the presumptive Basic Child Support Obligation by showing that a higher amount is in the best interests of the child. *Id.* § 8.

¶ 9 As applicable here, after determining the Basic Child Support Obligation from the Schedule, the superior court then must add to that figure "the cost of the children's medical, dental and/or vision insurance coverage, if any" and also may add childcare costs "appropriate to the parents' financial abilities" and "reasonable and necessary" education expenses "when such expenses are incurred by agreement of both parents or ordered by the court." *Id.* § 9(A), (B)(1), (2). Except in the event of a court-ordered deviation, the resulting sum is the "Total Child Support Obligation," for which the parents share responsibility in proportion to their respective gross incomes. *Id.* § 10.[4]

---

2. Absent material revision after relevant date, we cite a statute's current version.

3. The Schedule allows for certain deductions in a parent's gross income that are not relevant here. Guidelines, § 7.

4. When the two parents' incomes are not equal, but the children will spend an "essentially equal" amount of time with each parent, "the total child support amount shall be divided equally between the two households and the parent owing the

### 2. The court's calculation and division of the Total Child Support Obligation.

¶ 10 Pursuant to the Schedule, when, as here, the parents' combined monthly gross income is $20,000 a month or more, the Basic Child Support Obligation for three children is $2,795. As noted above, to this amount, the court must add certain medical and dental expenses (and may add childcare and education expenses) to derive the Total Child Support Obligation.

¶ 11 The decree in this case acknowledges the children's monthly medical and dental insurance expenses of $1,314 and education expenses of $1,750, and, according to the record, monthly childcare expenses were $2,000. But the record does not show that the court added those amounts to the Basic Child Support Obligation, as the Guidelines require. The child support worksheet the court completed did not take into account any of those expenses. Instead, the worksheet endorsed the presumptive Basic Child Support Obligation amount of $2,795 as the Total Child Support Obligation without recognizing any insurance, education and/or childcare expenses.

¶ 12 As noted, the Guidelines also require the court to divide the Total Child Support Obligation between the two parents based on their proportionate gross monthly incomes. Although the superior court imputed to Mother a specific income in excess of $20,000 a month, it did not determine Father's monthly gross income; as a result, it could not and did not determine the proportionate relationship between the parties' respective gross incomes.

¶ 13 Without making a finding of each parent's income and then allocating the Total Child Support Obligation in proportion to their respective incomes, as the Guidelines instruct, the decree ordered Father to continue to pay the children's medical and dental insurance expenses and their educational expenses. The decree then continued:

> greater amount shall be ordered to pay what is necessary to achieve that equal share in the other parent's household." *Id.* § 12 & Example.

Father and Mother will divide "all reasonable and necessary non-covered health-related expenses for the children," 90%/10%;

Father and Mother will divide "all mutually agreed-upon extra-curricular activities for the children," 90%/10%;

Father and Mother will divide the parenting coordinator's fees, 75%/25%; and

"As to all other costs and expenses divisible between the parties not specifically addressed herein, [Father] shall pay 72% and [Mother] shall pay 18%." [5]

The decree does not clarify the nature of the "other costs and expenses divisible between the parties" to which the final provision above applies, and at oral argument before this court, neither party expressed a clear understanding of the meaning of the provision. The parties do agree, however, that beyond the responsibility for insurance, education, health-care and parenting-coordinator expenses recited above, the decree imposes no child-support obligations on Father.

### 3. Failure to follow the process set out in the Guidelines.

¶ 14 Although Mother also takes issue with the superior court's rejection of her request for an upward deviation in child support (*see infra* ¶¶ 16–20), she argues the court erred in the first instance by failing to follow the analytical process set out in the Guidelines. *See* ¶¶ 8–9 *supra.* Mother contends the court erred by failing to determine whether childcare costs should be added to the Basic Child Support Obligation in calculating the Total Child Support Obligation, by failing to determine Father's monthly gross income, and then by failing to allocate the Total Child Support Obligation between the parties in proportion to their monthly gross incomes.

¶ 15 As Mother argues, the record does not demonstrate that the superior court followed the analytical process dictated by the Guidelines, and to the extent the court failed to follow that process, it erred. *See Little v.*

5. It is not clear from the record whether the court later corrected the "72/18" division of expenses in this provision to another that sums to 100 percent.

*Little,* 193 Ariz. 518, 521, ¶ 6, 975 P.2d 108, 111 (1999) (Guidelines "provide procedural guidance in applying the substantive law"). Father contends that at the end of the day, the court did not abuse its discretion in making the payment orders contained in the decree. It may be that the court would have come to roughly the same conclusions had it engaged in the analysis the Guidelines require it to perform. On this record, however, we cannot discern whether that is so. Therefore, on remand, after considering whether an upward deviation in Total Child Support Obligation is required, *see infra* ¶¶ 16–20, and determining what insurance, education and childcare expenses should be added to the Basic Child Support Obligation pursuant to Guidelines, § 9, the superior court then should determine Father's gross monthly income and allocate the Total Child Support Obligation between the parties in proportion to their gross incomes. After performing that division, the court may order the parties to make specific child-support payments consistent with the outcome of its analysis.

#### 4. Upward deviation.

¶ 16 Mother argues the superior court also erred by failing to grant an upward deviation in child support. The Guidelines provide that a parent seeking more than the presumptive child-support amount derived from the Guidelines and the Schedule "shall bear the burden of proof to establish that a higher amount is in the best interests of the children." Guidelines, § 8. The superior court has broad latitude to fashion an appropriate award of child support, and we will uphold the award unless it is "devoid of competent evidence." *Jenkins v. Jenkins,* 215 Ariz. 35, 37, ¶ 8, 156 P.3d 1140, 1142 (App.2007) (quotation omitted).

¶ 17 At trial, Mother called Michael Miskei, a certified public accountant, who testified that based on the family's historical expenditures, Mother was entitled to receive $22,500 in monthly child support.[6] On appeal, Mother argues the superior court erred

by holding that because she failed to prove she is entitled to that precise amount of child support, she was entitled to no upward deviation of any amount. She points to a footnote in the decree stating:

> The Court determines that it is not up to the Court to correct, re-calculate, or otherwise adjust the amount sought in the upward deviation. By statute, the burden of establishing the need for the deviation is on the party seeking the deviation. Thus, if the amount sought is incorrect, it is for the proffering party to correct not the Court.

¶ 18 As the decree states, Mother had the burden to prove that her request for a higher amount of child support was in the children's best interests. Contrary to the statement in the footnote, however, nothing in the Guidelines or other law provides that a parent who does not prove every penny of a specific requested amount of upward deviation is entitled to no deviation whatsoever. Instead, in asking the court to establish a child-support amount in excess of the amount derived from the Schedule, Mother only had to prove that some upward deviation was in the best interests of the children. For its part, as the trier of fact, the superior court shall grant whatever amount of upward deviation it finds is supported by the evidence under the applicable legal principles.

¶ 19 Although Father argues that notwithstanding the footnote, the superior court went on to conclude that Mother failed to prove any amount of upward deviation was appropriate, the decree does not so state. To the contrary, the decree supports Mother's assertion that, consistent with the footnote, the court denied any upward deviation because it found she had not proved that the best interests of the children required the specific amount of upward deviation she sought. For example, in analyzing the key factor under the Guidelines, § 8, of "the needs of the children in excess of the presumptive amount," the decree concludes,

6. There is some confusion in the record whether Miskei's calculated number represented his opinion of the Total Child Support Obligation, to be divided between Mother and Father in propor-

tion to their income, or, as the decree stated, was intended to represent the amount Father should pay in monthly support.

"[t]he Court did not find that [Mother] established a need by the children to receive $22,500 in excess of the presumptive amount." Later, the decree states, "THE COURT FINDS that [Mother] has not demonstrated that a child support amount of $22,500 is necessary or in the best interest of the children."

¶ 20 Because we cannot determine that the court gave due consideration to Mother's request for an upward deviation in child support, we vacate the decree's treatment of that issue and remand for further proceedings consistent with this decision. Below, we address certain issues that may arise again on remand.

### 5. Mother's expert witness.

¶ 21 Although the superior court concluded that Miskei's qualifications and testimony did not satisfy Arizona Rule of Evidence 702, it nevertheless considered Miskei's testimony, but ultimately declined to accept his opinions because it found they were "neither reliable nor correct." [7] Mother argues the superior court erred in ruling that Miskei was not qualified. She argues Miskei has testified "hundreds of times in courts in several states, using the same type of information he used here." Setting aside whether Miskei qualified as an expert witness pursuant to Rule 702, the court did not abuse its discretion in declining to accept his analysis. Without recounting the particulars, numerous analytical flaws revealed during Miskei's cross-examination support the court's decision to reject his testimony.

### 6. The children's needs.

¶ 22 In considering Mother's request for an upward deviation in child support pursuant to § 8 of the Guidelines, the superior court heard testimony by Mother and Father

relating to "the standard of living the children would have enjoyed if the parents and children were living together [and] the needs of the children in excess of the presumptive amount." Guidelines, § 8. On appeal, Mother argues the court erred because it considered only whether the presumptive child-support amount was sufficient to satisfy the children's "basic needs." She points to the conclusion in the decree that, given both parents' resources, "the basic needs *of the children* will be more than adequately met without an upward deviation." As Mother argues, in explaining its analysis, the court described this factor as whether "additional money is needed to provide for the basic standard of living for the minor children." [8]

¶ 23 Under the circumstances presented here, to the extent the court rejected an upward deviation in child support because it concluded the presumptive amount satisfied the children's basic needs, it erred. In determining child support, the superior court must consider the reasonable needs of the children in light of the parents' resources. In determining whether an upward deviation in child support is appropriate in a case such as this, the court must give considerable regard to the reasonable benefits, beyond their "basic needs," accorded to the children during the marriage. *See* Guidelines, Background ("The total child support amount approximates the amount that would have been spent on the children if the parents and children were living together."); *id.* ¶ 8.

¶ 24 Even though the court in this case rejected the opinions of Mother's expert witness, it received considerable other evidence of the expenses of the parents' respective households in Arizona and elsewhere. Both parties agreed they wanted to continue to expose their children to diverse cultures and cultural events. While travel expenses were

---

7. Trial in this matter occurred before the effective date of the 2012 amendments to the Arizona Rules of Evidence.

8. The record reflects that Father had offered to pay a specific amount of upward deviation in child support, and in considering Mother's request for an upward deviation, the court assumed that she would accept Father's offer: "It is especially concerning to the Court that [Mother] did not offer any evidence that the children

will have any reasonable monthly financial needs in excess of the child support amount being offered by [Father] or why the best interests of the children mandate more child support than offered by [Father]." But the court did not order Father to make the payments he offered, and according to the record, in the absence of Mother's acceptance of that amount in settlement, he has not done so.

a point of contention, Father did not dispute that the children should continue to enjoy regular extensive international travel, including regular visits with their maternal relatives in South America and Australia; and other travel, including ski vacations; the dispute was only about the nature and style of that travel. Although the family may have spared few expenses in the manner in which it traveled during the marriage, Mother testified that coach airplane tickets to South America are $1,500 apiece. The superior court seemed to accept that the children should be able to continue to travel extensively, noting "the Court understood Father's objection to be the *manner* of travel ... not the destination." In spite of this finding and the other evidence in the record, however, the court apparently did not consider the family's demonstrated travel, entertainment and housing expenses in determining whether to grant an upward deviation in child support. *See* Guidelines § 8 (court should take into account such factors "as the needs of the children in excess of the presumptive amount ... and any other factors which, on a case by case basis, demonstrate that the increased amount is appropriate.")

¶ 25 Expenses associated with international travel and households such as those of these parties usually are not relevant to the child-support needs of children in less affluent households. But in deciding child support after the dissolution of marriages such as this one, involving significant wealth, the superior court must consider the expense of allowing children who have enjoyed such benefits to continue to receive them after the dissolution.

¶ 26 As other state courts have concluded, in such a situation, the court must look beyond the "basic necessities of survival" because children are entitled to share reasonably in their parents' economic good fortune. *See Miller v. Schou,* 616 So.2d 436, 438–39 (Fla.1993); *accord Hansel v. Hansel,* 802 So.2d 875, 882–83 (La.App.2001) (correct standard is pre-divorce standard, not "basic needs"); *Isaacson v. Isaacson,* 348 N.J.Super. 560, 792 A.2d 525, 537, 539 (N.J.Super.A.D.2002) (beyond bare necessities, a wealthy parent must "share with the children

the benefit of his financial achievement," including reasonable but "non-essential items" such as "tutoring, summer camps, sports clinics, music or art lessons, vacations [and] study abroad") (quotation omitted); *Montgomery v. Montgomery,* 481 N.W.2d 234, 236 (N.D.1992) ("needs of a child in a family with substantial income are more expansive because of the standard of living the family has enjoyed") (quotation omitted); *Branch v. Jackson,* 427 Pa.Super. 417, 629 A.2d 170, 171 (1993) ("reasonable needs of a child whose parent or parents are wealthy may well include items which would be considered frivolous to parents who are less well off"); *Harris v. Harris,* 168 Vt. 13, 714 A.2d 626, 633 (1998) (needs of affluent children grow along with their parents' good fortune).

¶ 27 In declining to grant Mother's request for an upward deviation, the superior court stated it accepted Father's contention that "overindulging the children is not in their best interest." We do not mean to say that the court must provide child support that matches historical spending patterns, dollar-for-dollar. *See In re Patterson,* 22 Kan.App.2d 522, 920 P.2d 450, 455 (1996) ("no child, no matter how wealthy the parents, needs to be provided more than three ponies"). Because the touchstone always is the best interests of the child, a child's share in the good fortune of his or her parents must be subject to the limitation that the award be "consistent with an appropriate lifestyle." *Miller,* 616 So.2d at 439; *see also Isaacson,* 792 A.2d at 539 (supporting parent has the "right to participate in the development of an appropriate value system for a child" by limiting expenses to those that are reasonable). Under circumstances such as these, the court may conclude that the pre-dissolution lifestyle of the children need not be precisely replicated, particularly when, as here, one parent persuasively argues in favor of more modest conditions.

¶ 28 Finally, the superior court may not avoid this analysis by simply concluding that the parent seeking the upward deviation has sufficient resources by herself to provide the children the lifestyle they enjoyed during the marriage. The issue is not whether the parent who seeks the up-

ward deviation can afford to provide the children with their pre-dissolution lifestyle without assistance from the other. Particularly the unusual circumstances present here, when Father's income and wealth may significantly exceed Mother's, the court may not fail to perform the analysis the Guidelines require. *See* Guidelines, ¶ 8.[9]

## B. The Order Prohibiting the Parents from Posting Disparaging Remarks About Each Other on Social Media.

¶ 29 The parties' joint custody agreement, which the court approved, included the following language:

> All communications between the parents shall be respectful. The parents agree that neither parent shall disparage the other party to the children, and that each parent shall model respect for the other parent in their interactions with the children. Neither parent shall do or say anything to the children that would negatively impact the child's opinion or respect for the other parent.

¶ 30 The day the decree issued, Mother used her Twitter account to "tweet" a biting criticism of Father's integrity, the specifics of which are not relevant here. A few days later, at Father's request, the court-approved parenting coordinator issued the following recommendation:

> Mother is cautioned against communicating about Father in a negative and pejorative way, especially using social media. Most recently, it has been brought to the [Parenting Coordinator]'s attention that Mother has "tweeted" about Father in an unflattering way. Mother is entitled to her own feelings about Father. However, using social media to tell the world how she views Father is insensitive to Father's

role in relationship to his children. If parents of the children's friends, for example, were to view Mother's comments, it could negatively influence the parents and their children regarding the Nash children. The [Parenting Coordinator]'s concern is the collateral effect to the children. Mother must stop these activities.

■■■ ¶ 31 The superior court issued the following order adopting the parenting coordinator's recommendations:

> With respect to the allegations [about the tweet], the parties are reminded that the [joint custody agreement] is an Order of the Court. Violation of the terms of the [joint custody agreement] is not solely a matter resolved by the Parenting Coordinator, but is enforceable by the Court. The life span of social media is indefinite. Distribution of social media postings cannot be effectively controlled or contained. Disparaging comments made by either party regarding the other party violates the [joint custody agreement] and is likely, over time, to be viewed by the minor children. The parties are reminded that such conduct is prohibited.

Mother argues the order violates her First Amendment right to free speech. We review alleged constitutional violations *de novo*. *State v. McGill*, 213 Ariz. 147, 159, ¶ 53, 140 P.3d 930, 942 (2006).[10]

■■■ ¶ 32 The order prohibits the parties from posting "disparaging comments" about each other in social media. Prior restraints on speech are the most serious and least tolerable infringement on First Amendment rights. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Although not all prior restraints are invalid, they come with a heavy presumption

---

9. Mother also argues the superior court erred when it considered what she received in the property settlement in determining whether to grant an upward deviation in child support. *See Walsh v. Walsh*, 230 Ariz. 486, 496, ¶ 32, 286 P.3d 1095, 1105 (App.2012); Guidelines, ¶ 5(G). We reject Mother's argument because nothing in the Guidelines or in *Walsh* precludes the court from considering the income a parent will receive from an asset awarded in the dissolution when it is determining gross income for purposes of a child-support award.

10. Father argues Mother waived her right to complain about the order because she failed to object to it within 10 days as required by Arizona Rule of Family Law Procedure 74(J). Mother filed her objection 21 days after the order issued, but argues she did not receive the order promptly because of delays caused by the court's determination to seal all orders entered in the case. Under the circumstances, we exercise our discretion to consider Mother's argument.

against constitutional validity. *Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *State v. Book–Cellar, Inc.*, 139 Ariz. 525, 530, 679 P.2d 548, 553 (App.1984). The "presumption of invalidity can be overcome if the restriction ... serves a compelling governmental interest, is necessary to serve the asserted [compelling] interest, is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose." *Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) (quotation omitted); *see Sable Commc'ns of Cal. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (protection of children's psychological well-being is compelling interest; regulation restraining indecent sexual expression may be upheld if narrowly tailored to serve that interest).

■ ¶ 33 Orders barring a parent from disparaging the other in front of the children are common in dissolution matters. *See, e.g., In re Marriage of Hartmann*, 185 Cal. App.4th 1247, 111 Cal.Rptr.3d 242, 245 (2010); *In re Marriage of Olson*, 69 Wash. App. 621, 850 P.2d 527, 532 (1993). Nevertheless, general concern for the best interests of the children will not necessarily allow a court to broadly restrain a parent from making disparaging comments about the other to third parties. *See, e.g., In re K.D.*, 929 N.E.2d 863, 871–72 (Ind.App.2010) (reversing as overbroad an order barring mother from talking to "any media source or others" about allegations in custody case, citing lack of evidence that child "would suffer if Mother continued to talk to the media"); *In re T.T.*, 18 Neb.App. 176, 779 N.W.2d 602, 621 (2009) (vacating order barring parents from disclosing information about their child for lack of evidence "to satisfy the State's heavy burden to justify this prior restraint on free speech"); *see generally Brown v. Entm't Merchs. Ass'n*, —— U.S. ——, 131 S.Ct. 2729, 2736, 180 L.Ed.2d 708 (2011) (although government "possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed").

■ ¶ 34 Mother argues the order at issue here cannot survive constitutional scrutiny. But in the joint custody agreement that the court entered as an order upon their request, she and Father agreed to certain restrictions on their speech by pledging to "model respect for the other parent in their interactions with the children" and not to "disparage the other party to the children." Mother argues the order at issue goes beyond her agreement not to disparage Father in comments made directly to the children. As she argues, the order encompasses comments she might make to others outside the presence of the children, by way of Twitter or any other social medium.

¶ 35 We take judicial notice, however, of the fact that, depending on the circumstances, comments Mother posts on social media about Father may not remain private but may make their way to the children, perhaps in very short order.[11] This is particularly true because Father has a highly visible profile as a professional athlete. Accordingly, we cannot accept Mother's argument that the order is invalid simply because it goes beyond the letter of the parties' agreement to refrain from making disparaging remarks about the other in the presence of the children. To the contrary, to the extent that the order prohibits Mother and Father from disparaging the other by way of public remarks that are likely to make their way to the children, the order is true to the spirit of the parties' agreement. *See generally Adams v. Tersillo*, 245 A.D.2d 446, 447, 666 N.Y.S.2d 203 (N.Y.App.Div.1997) (limiting scope of restraint to comments made in the presence of the children or "in the presence of those who have contact with the children").[12]

11. *See* Comment, 161 Penn. L. Rev. 1081, 1119 (2013) ("Writing nasty, disparaging comments on a blog where the children, ages ten and twelve, could easily find them is practically the same as saying it to them; it may also humiliate the children if their peers discover the blog and question them about it."); *see also* Ariz. R. Evid. 201(b).

12. Mother does not argue with the premise of the order, namely, that posts on social media by definition are public such that, if she posts a disparaging comment on social media, that com-

¶ 36 For these reasons, we conclude the superior court did not abuse its discretion in entering the order barring both parties from disparaging the other by way of social media.

## C. The Order Precluding Dissemination of Documents and Information in the Court Record.

¶ 37 Mother also challenges the court's *sua sponte* order that "[d]ocuments, records, and transcripts sealed by the Court, and information contained in the sealed material, may *not* be disseminated to any third party without an Order of the Court." Not only does the order bar either party from disclosing copies of any court filing, it also prevents them from discussing the outcome of the proceeding or disclosing any information contained in documents, records or transcripts without prior court approval. It broadly applies to all such information, without regard to its source and without identifying any significant interest sought to be protected.

¶ 38 Because the order preemptively forbids speech concerning a public proceeding, it is a classic prior restraint on speech. *See, e.g., Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). Father does not argue the order is required to protect his interest in a fair trial. *Cf. Neb. Press Ass'n,* 427 U.S. at 570, 96 S.Ct. 2791 (order prohibiting media accounts of criminal proceeding invalid on First Amendment grounds). Instead, Father argues the order is a "logical extension" of stipulations the parties entered prior to trial asking the superior court to seal particular filings.

¶ 39 But the order at issue bars disclosure of any matter in the court's record, not just documents the parties agreed would be sealed or kept confidential. Moreover, Father does not point to any stipulation by which the parties agreed not to disclose the outcome of the dissolution proceeding or, more broadly, any information contained in any filing they made in the proceeding. Nor

does Father identify any specific information contained in the court's file whose disclosure would threaten the best interests of the children or any factual finding by the court that would justify the order.

¶ 40 Pursuant to Arizona Rule of Family Law Procedure 13(D), the records relating to a dissolution proceeding "shall be maintained and disclosed in accordance" with Rule 123(c)(1) of the Rules of the Arizona Supreme Court, which in turn provides that court records "are presumed to be open to any member of the public for inspection." [13] While Arizona Rule of Family Law Procedure 13(D) allows the superior court to "make any record of a family court matter closed or confidential or otherwise limit access to such records," the court may issue such an order only upon "a finding that the confidentiality or privacy interests of the parties [or] their minor children ... outweighs the public interest in disclosure." Ariz. R. Fam. L.P. 13(D).

¶ 41 To the extent the order at issue bars the parties from disclosing the decree or any other filings made in the case, it fails because it is unsupported by the findings that Rule 13(D) or Rule 123(c)(1) of the Arizona Supreme Court requires. Moreover, to the extent the order bars the parties from disclosing any information contained in any court filing, it cannot withstand scrutiny under applicable First Amendment principles. We therefore vacate the order.

## CONCLUSION

¶ 42 For the reasons stated above, we vacate the decree insofar as it addresses child support. We affirm the order the superior court entered restricting the parties' comments about the other on social media, but vacate its order barring the parties from disclosing any information or document in the court's file. We deny both parties' requests for attorney's fees incurred in this appeal pursuant to A.R.S. § 25–324(A) (West

ment may make its way to the children. Nor on appeal does she argue that the order is overbroad in that it precludes all "disparaging" comments.

**13.** Arizona Rule of Family Law Procedure 43(G) allows for the confidential treatment of documents containing "sensitive data," meaning Social Security numbers and the like.

2013), but grant Mother her costs on appeal, pursuant to Arizona Rule of Civil Appellate Procedure 21.

CONCURRING: SAMUEL A. THUMMA, Presiding Judge and MICHAEL J. BROWN, Judge.