SWANN, Judge:
¶ 1 In this family-law case, the superior court entered orders requiring that the parent awarded sole legal decision-making provide a child with therapy from specified providers, and that both parents abstain from certain parenting choices, including the discussion of sensitive topics with the child. We vacate those orders. No statutory authority enabled the court to direct the sole decision-maker's choices regarding therapy, or to impose parenting-time limits that infringed the parents' constitutional rights to parent and engage in free speech. The court also entered orders conferring judicial immunity on the appointed therapists. We vacate those orders because a therapist is not accountable to the court. We also vacate the court's award of attorney's fees and costs to the appellee. The award was based at least in part on the court's erroneous determination that the appellant unreasonably opposed the therapist appointments. We remand so that the court can consider whether fees are warranted based on the parties' financial disparity alone.
FACTS AND PROCEDURAL HISTORY
¶ 2 Paul E. ("Father") and Courtney F. ("Mother") married in 2004 and thereafter had three children together, including L., born in 2007. Father and Mother divorced in 2010. The decree of dissolution gave the parties joint legal custody of the children, with final legal decision-making authority awarded to Father with respect to L.'s and one of the other children's education, medical care, and dental care. Mother was awarded final legal decision-making authority with respect to the remaining child's education, medical care, and dental care. The parties were awarded equal parenting time with respect to all three children.
¶ 3 In February 2013, Mother permitted L., who was born male, to wear a skirt to school. She also sent a "Princess Boy" book for L.'s teacher to read to the class. Mother consulted with others (but no professionals) and notified L.'s school beforehand, but she failed to inform Father until after L. arrived at school. According to Mother, L. had long demonstrated a preference for stereotypically "female" items and would wear female clothing at home; Father reported no previous knowledge of L. wearing female clothing, and apparently did not observe any distinctive gender pattern in L.'s preferences. Soon after L. wore the skirt to school, Father made arrangements for L. to begin therapy with counselor Diana Vigil, who continued in that role throughout this case.
¶ 4 According to Father and Vigil, in 2013 the parents agreed, consistent with Vigil's *416 recommendation, to limit L.'s access to female-oriented items; Mother disputed that the parties ever reached a firm agreement. In late 2013, Father filed a petition under A.R.S. § 25-411(A) to modify parenting time and legal decision-making with respect to all three children. Father alleged, as relevant to this appeal, that Mother, through various acts, was pushing a female gender identification on L. despite Vigil's failure to diagnose L. with gender dysphoria, defined in one source used at trial as "[p]sychological distress due to the incongruence between one's body and gender identity," with gender identity meaning "[a] person's internal sense of being male, female, or something else." Father requested, inter alia , that he be made L.'s primary residential parent and be awarded sole legal decision-making. Father further requested that the court immediately limit Mother's parenting time through temporary orders and injunctions.
¶ 5 On December 13, 2013, consistent with Father's requests, the court entered the following temporary orders:
• Until further Court order, Mother shall not dress [L.] in female clothing, shall not purchase female or "girl" clothing for [L.], shall not to [sic] permit [L.] to dress in female clothing (including, but not limited to underwear, socks, shirts, dresses, skirts, etc.), shall not purchase female oriented toys or other items for [L.], shall not refer to [L.] in his presence or in the presence of any of the other children as "her" or "she," shall not refer to [L.] as a "girl" or by other female designation, and shall not encourage any of the parties' other children to do so, shall not to [sic] encourage or direct third parties to refer to [L.] as "her," as "she[,]" as a "girl," or as other female designation, or to treat him as such, and shall not to [sic] take any other actions that are inconsistent with the spirit of these orders.
• Until further Court order, Mother shall remove from her home any female or "girl" clothing of or for [L.] and any female oriented toys or other items of or for [L.] Mother may store such items elsewhere for later use in the event the Court later modifies or vacates these orders.
• Until further Court order, Mother also shall direct the parties' children not to refer to [L.] as "her," as "she," as a "girl" or as other female designation, or if Mother hears or becomes aware of any of those children doing so [sic].
• Until further Court order, Mother shall not refer to [L.] as "gender variant" or use such term or any related terms in [L.]'s presence or in the presence of the parties' other children. Mother further shall refrain from any discussion of gender related issues with [L.], with any of the parties' other children or in [L.]'s or any of the parties' other children's presence.
• Mother shall not provide [L.] or any of the parties' other children with any materials addressing gender preference.
• Mother shall not take any actions to frustrate or defy the spirit of any of the foregoing orders.
¶ 6 Vigil recommended that L. be assessed by a psychiatrist. In 2014, L. was evaluated by a series of professionals-a psychologist in July 2014, a physician in September 2014, and a psychotherapist in December 2014-each of whom diagnosed L. with gender dysphoria. Later, Vigil also diagnosed L. with gender dysphoria.
¶ 7 The temporary orders, however, remained in place. And Father, to whom the orders did not apply, did not afford L. access to "female" items during his parenting time. According to Father, he was never unwilling to provide L. the opportunity to engage in "gender exploration" but he and Mother believed that the temporary orders applied to both parents. Father reported that Mother was repeatedly noncompliant with the orders; Mother maintained the opposite.
¶ 8 In early 2015, L. made statements about dying, and either threatened or engaged in self-harm. Mother did not promptly notify Father when she took L. to the hospital in response to that behavior. Also in early 2015, Mother reneged on her promise to Father to take L. and another of the parties'
*417 children to a sacramental religious ceremony at Father's church.
¶ 9 In mid-2015, Vigil told the parties, and Father agreed based on a log he kept of L.'s statements and behaviors, that L. had become more comfortable with L.'s natal gender. Mother apparently informed L. of Vigil's conclusion, which caused L. to distrust Vigil. And, according to Father, Mother then significantly increased her violations of the temporary orders, and L. increasingly engaged in feminine behaviors. L. also assigned blame to Father for the temporary orders.
¶ 10 By stipulated order, the court appointed Dr. Paulette Selmi, a psychologist, to perform a custody evaluation. Dr. Selmi opined that the manner in which Mother responded to L.'s desire to wear a skirt to school did not take into account the need to protect L. Dr. Selmi further determined that Mother exposed L. to inappropriate information regarding sex reassignment, and failed to comply with the parties' 2013 agreement and the court's temporary orders. Dr. Selmi opined that Mother's conduct demonstrated a lack of foresight. Dr. Selmi conceded that the temporary orders had harmed L., but she concluded that a "social transition" was not in L.'s best interests because of L.'s young age, and "[i]t is best to take a slower approach to the situation." Dr. Selmi recommended that the temporary orders "be lifted at this time but not entirely," by remaining in place at Mother's home for at least six months to a year and being lifted entirely at Vigil's office and in Father's home for six months to a year. Dr. Selmi recommended that only Vigil discuss the change with L., "because [the parents] do not work well enough together to do this." Further, finding that Mother has "a proven track record ... of talking to [L.] about very inappropriate things i.e. hormones, sex change operations and the like," Dr. Selmi recommend that the court enter a " 'gag order' prohibiting Mother [and potentially Father as well] from discussing anything with [L.] related to this topic." Dr. Selmi opined that L. "must" continue therapy with Vigil, preferably on a "safe-haven" basis to restore and preserve L.'s trust in Vigil, and further stated that "there also needs to be a physician gender specialist who will follow [L.] along the way."
¶ 11 Father's petition to modify proceeded to a four-day trial in December 2015. By that time, the only question was legal decision-making-Father withdrew his request for a modification of parenting time, explaining that "kids need their mom" and he had not originally thought of managing his concerns regarding Mother's behavior via "the gag order that Dr. Selmi had advanced." The court notified the parties at the outset of the trial that the court intended to itself direct certain decisions regarding L.'s therapeutic care. The court stated that there is "a school of thought with some judges that [the court] say[s] ... somebody has legal decision-making[, t]hat person makes the call[,] ... [and t]he judge doesn't jump in the middle of it," but in view of "the history that you've got about not agreeing on things and the complexity that we've got with respect to [L.,] ... I'm likely going to address it," because "we've gotta address the rule [i.e., the temporary orders] and we've gotta address what's going to happen going forward and who's in place and who's not from a professional standpoint, and I intend to do that." Both at trial and thereafter, Father disputed the court's authority to make decisions regarding L.'s care.
¶ 12 At trial, Father and Mother agreed that L. would benefit from continued therapy and the care of a gender specialist. They disagreed, however, on how best to support L. Father advocated a conservative approach, in line with the recommendations of Dr. Selmi and the psychologist who diagnosed L. Mother had taken an active approach, more consistent with the views of the physician who diagnosed L.
¶ 13 Before the court ruled on the petition to modify, the parties sought guidance from the court regarding the role it envisioned for a court-appointed "gender expert." At a status conference on February 26, 2016, the court stated that it anticipated Vigil would continue as L.'s therapist. The court further stated, with respect to the gender expert, that:
from the court's perspective, this [gender-expert] assignment is going to be as a *418 treating professional, not serving the Court . I don't envision it as a forensic appointment. I envision it as a treating appointment.
And let me say also ... from my perspective, I think philosophically, I'm looking at this not that the expert or Diana Vigil or anyone else really that's working with, whether it's [L.] or any of the kids, is really working so that they can provide information for me to resolve disputes.
From my perspective, my hope is, is that after I issue the minute entry, I'm out of it and it's the parents who are making the decisions.
And so this expert is working with the parents, who are the decision-makers, ... and I do not want, an expert that's reporting to me and then I'm refereeing disputes.
I want the parents to resolve the issue, issues that come up. I want the parents to manage the interaction with the experts, and the parents to hopefully agree on a, on a course going forward.
(Emphasis added). The court then stated that the term of the appointment would be left to the expert. And, to alleviate reluctance of potential experts to assume a role with no judicial immunity in a contentious case, the court expressed willingness to consider a "middle ground" approach under which the expert would be "designated as the Court's expert but their, their role and function is still as I envision, potentially more akin to a treating, treating professional."
¶ 14 Immediately following the status conference, the court issued a minute entry ordering "that Diana Vigil shall continue as a Safe Harbor Therapist for [L.]" and stating that "the Court believes that a 'therapeutic intervention' [under ARFLP 95(A) ] is necessary to guide the Court and the parties through gender identification issues." The court explained that it "intends to appoint a gender expert" and "considers the role of the gender expert to be a forensic one." It further explained that it expected the expert "to provide input and make [non-binding] recommendations to the Court, Diana Vigil and the parties regarding [L.]'s status, how to assess and interpret information, and potentially how to proceed," for a duration "dependent on [L.]'s situation." The court also ordered that the expert could "engage one or more additional individuals to assist the expert in his or her analysis."
¶ 15 Approximately a month later, the court ruled on Father's petition. It found that both Mother and Father were capable parents, but determined that all three children's best interests were served by awarding Father sole legal decision-making with an obligation to consult in good faith with Mother. The court then held that despite Father's sole authority, the circumstances empowered it to limit that authority under A.R.S. § 25-410(A). The court held that "[L.]'s gender dysphoria diagnosis and the parents' response to it has already caused [L.] emotional harm," and
[t]he complexity of [L.]'s situation, the dynamics of the parties' relationship and the potential for harm if it is not managed correctly lead the Court to a conclusion that the child's physical health would be endangered and emotional development impaired if the Court did not establish some guidelines for the parents in addressing [L.]'s situation.
¶ 16 The court further concluded that "a therapeutic intervention [under ARFLP 95(A) ] is necessary to guide the parties and the Court through [L.]'s gender identification process." It ordered:
• A "gender expert" shall be appointed to provide input to the Court and guidance to the parties regarding gender identification issues. The parameters set forth in the Court's [earlier] Minute Entry apply. The expert will be appointed by separate Court order.
• Diana Vigil will continue as [L.]'s therapist and will operate on a "safe haven" basis. She will consult with and work cooperatively with the gender expert. Should Ms. Vigil have questions regarding this Order she may seek clarification from the Court.
• Judge Viola's December 13, 2013 Order is vacated in part. The Rule [i.e., *419 the temporary orders] is lifted as it relates to gender exploration by [L.] in Diana Vigil's office, Father's home and Mother's home. In all other places, it remains in effect. Neither parent shall discuss the lifting of Judge Viola's order with [L.], or permit gender exploration in their home until Diana Vigil discloses to [L.] that the order has been lifted.
• Although [L.] will be free to explore in each parent's house, neither parent shall discuss gender identification issues with [L.] The parties should utilize a standard response as suggested by Dr. Selmi if [L.] asks to talk about gender identification issues, deferring the question or discussion to Diana Vigil. No person other than the gender expert (and his or her designee) and Diana Vigil shall discuss gender identification/exploration with [L.] The Court is open to allowing the parents to discuss gender identification issues in the future should such an approach be suggested by the gender expert.
• Neither parent may, directly or indirectly, promote or discourage a specific view of gender identification for [L.]
The court recognizes that the above orders may require fine tuning and the Court expects the parties to work with the gender expert and Diana Vigil to both follow these directives and address additional issues as they arise.
The court found that "the parties are likely to remain in conflict" but declined to appoint a parenting coordinator under ARFLP 74 because Father did not consent, and declined to appoint a family law master under ARFLP 72 because no petitions remained pending. The court affirmed the original parenting-time schedule but warned that "the Court will consider a change to the number of parenting days allocated to Mother if the Court determines that Mother is not complying with this Order." The court did not set a review hearing.
¶ 17 Father timely filed a motion for new trial, and Mother filed a motion to modify. While those motions were pending, the court appointed Dr. Diane Ehrensaft as "the gender expert in this matter." In later, unsigned minute entries, the court denied Father's motion, granted Mother's motion in part, and set oral argument for the purpose of clarifying Vigil's role and appointment terms.
¶ 18 Vigil submitted a proposed appointment order, which the court observed "parroted almost word-for-word language that is straight out of standard minute entries that have been issued by many judges here." Father objected that the court lacked authority to enter any appointment order, and he further objected to many of the specific provisions in Vigil's proposed order. The court responded that "appointments like this have been made continually from the family court and while that, in and of itself, may not be a reason to, to continue it, it gives me comfort that the judicial or quasi-judicial immunity is routinely granted. I just, from my perspective, ... don't see the mischief in it." The court identified A.R.S. § 25-405(B) and ARFLP 95 as the bases for the appointment.
¶ 19 The court entered orders giving both Vigil and Ehrensaft "the applicable judicial immunity consistent with Arizona case law applicable to quasi-judicial officers of the Court as to all actions undertaken pursuant to the Court appointment." With respect to Vigil, the court further ordered that she was "a Court expert" with judicial immunity, from whom "[t]he Court may seek ... advice" to be shared with counsel "upon request, under such terms as the Court determines." The court gave Vigil exclusive authority to determine L.'s treatment process and to decide whether any other clinician would evaluate or treat L.; gave her authority to communicate with all court-appointed professionals; gave her access to all treatment records for L., Mother, and Father; and precluded either parent from subpoenaing her records, calling her to testify, or eliciting her opinions or findings.[2]
*420 ¶ 20 At the oral argument regarding the appointment terms, the court indicated that it was "likely" and "inclined" to grant Mother's request for attorney's fees and costs regarding post-trial motions related to Vigil and Ehrensaft, but wished for Mother to submit a fee affidavit and for Father to file a response. Father's counsel asked whether the court was "making a finding that our positions were unreasonable." The court responded, "No. I am telling you that that is a distinct possibility." The court added that "from my perspective, some of, some of the positions taken by father have, in my view, been designed to frustrate the process," creating "a potential basis for attorney's fees based on the reasonableness of the positions." In its later minute entry, the court directed Mother to file an affidavit and concluded that a fee award was certain: "[b]ased on the reasonableness of the positions of the parties regarding certain post-trial motions relating to Diana Vigil and Dr. Ehrensaft, and due to the respective financial positions of the parties, the Court will award Mother attorney's fees, ... pursuant to A.R.S. § 25-324." (Emphasis added.)
¶ 21 Mother filed an affidavit and application requesting approximately $42,000 in fees and costs. Father filed a response, in which he stated in a footnote that "[b]ecause there has been a request for findings of fact and conclusions of law in this case, it was incumbent upon Mother's Application to establish, and for the Court subsequently to find, that specific positions Father took were unreasonable." Finding "that Father's post-trial positions regarding the appointments of Dr. Ehrensaft and Diana Vigil were unreasonable and an award of fees is appropriate pursuant to A.R.S. § 25-324(A)," the court awarded Mother $22,000 in fees and $679 in costs. The court held that the balance of the fees Mother sought did not relate to the appointment issues.
¶ 22 Father timely filed a notice of appeal from a November 2016 omnibus order incorporating the court's legal decision-making determinations into appealable rulings, and he timely filed a notice of appeal from the signed attorney's fees ruling entered in January 2017. Both of Father's notices of appeal are before us now.
DISCUSSION
¶ 23 The superior court's award of sole legal decision-making to Father is not at issue on appeal.[3] The central question is instead whether the court lawfully entered its "guidelines" restricting Father's exercise of the sole authority and both parents' exercise of their parenting time.
I. THE SUPERIOR COURT ERRED AS A MATTER OF LAW BY DICTATING L.'S THERAPEUTIC CARE.
A. The Court Had No Authority to Infringe on Father's Sole Legal Decision-Making.
¶ 24 Legal decision-making is "the legal right and responsibility to make all nonemergency legal decisions for a child including those regarding education, health care, religious training and personal care decisions." A.R.S. § 25-401(3). The court must determine legal decision-making, whether initially or on a motion for modification, based on "the best interests of the child." A.R.S. § 25-403(A). The court has broad discretion to determine the child's best interests. Orezza v. Ramirez , 19 Ariz. App. 405, 409, 507 P.2d 1017 (1973). But though "[c]ourts may do many things in the best interests of children, ... they cannot advance such interests by exercising jurisdiction that they lack. Every power that the superior court exercises ... must find its support in the supporting statutory framework." Fenn v. Fenn , 174 Ariz. 84, 87, 847 P.2d 129, 132 (App. 1993) ; see also Graville v. Dodge , 195 Ariz. 119, 128, ¶ 41, 985 P.2d 604, 613 (App. 1999) ("While we believe the trial court has inherent authority to issue orders as part of its duty to *421 fashion a visitation plan that is in the best interests of the children, we believe that a court must confine its exercise of that authority within the limits of the statute."). We review issues of statutory interpretation de novo. Baker v. Meyer , 237 Ariz. 112, 116, ¶ 10, 346 P.3d 998, 1002 (App. 2015).
¶ 25 Title 25 of the Arizona Revised Statutes creates a framework for legal decision-making under which "[t]he court's statutorily prescribed role is not to make decisions in place of parents, but to decide which fit parent or parents shall make such decisions." Nicaise , --- Ariz. at ----, ¶ 27, ---P.3d at ----.[4] Section 25-401 defines two forms of legal decision-making, both of which describe parental-not judicial-authority. See also A.R.S. § 25-403.02(C)(1) (requiring parents to designate, in parenting plans, whether legal decision-making should be "joint or sole as defined in § 25-401"). " 'Joint legal decision-making' means both parents share decision-making and neither parent's rights or responsibilities are superior," and " '[s]ole legal decision-making' means one parent has the legal right and responsibility to make major decisions for a child." A.R.S. § 25-401(2), (6) ; see also A.R.S. § 25-410(A) (confirming that in most cases "the parent designated as sole legal decision-maker may determine the child's upbringing, including the child's education, care, health care and religious training").
¶ 26 Accordingly, though
[a] court faced with uncooperative, recalcitrant parents might reasonably believe that a child's best interests would be served by an order that effectively resolves a disputed issue[,] ... in a family-law case, the court does not have plenary authority to make decisions in place of the parents when it deems them to be in a child's best interests. Rather, the court must be guided by the best interests of a child in assigning legal-decision-making authority.
Nicaise , --- Ariz. at ----, ¶ 28, --- P.3d at ----. The reservation of decision-making to fit parents, rather than the judiciary, accommodates "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" under the Fourteenth Amendment. Troxel v. Granville , 530 U.S. 57, 66, 120 S.Ct. 2054 (2000) (plurality opinion); see also Goodman v. Forsen , 239 Ariz. 110, 112-15, ¶¶ 9-18, 366 P.3d 587, 589-92 (App. 2016) (discussing constitutional right to parent in context of third-party-visitation statute assigning "special weight" to parents' opinions). Of course, in choosing which fit parent or parents shall make the decisions, the court should consider each parent's proposed decisions and assess which parent's plans would serve the child's best interests. Nicaise , --- Ariz. at ----, ¶ 30, --- P.3d at ----. But the court generally has no say in the actual decisions of the chosen parent or parents. Even when an allocation of legal decision-making ultimately proves contrary to the child's best interests, the court may typically do no more than reallocate the authority between the parents. See A.R.S. § 25-411(A).
¶ 27 There is one narrow exception, set forth in § 25-410(A), that permits the court, on motion and after a hearing, to limit a sole decision-maker's authority. Section 25-410(A) provides:
Except as otherwise agreed by the parties in writing ..., the parent designated as sole legal decision-maker may determine the child's upbringing, including the child's education, care, health care and religious training, unless, on motion by the other parent, the court, after a hearing, finds that in the absence of a specific limitation of the parent designated as the sole legal decision-maker's authority, the child's physical health would be endangered or the child's emotional development would be significantly impaired.
(Emphasis added.) Section 25-410(A)"gives recognition to ... the firmly established principle that at all levels, at all times and in all forums, the welfare and best interest of the child is of prime and overriding importance as measured by the particular facts and circumstances of each case before the courts."
*422 Funk v. Ossman , 150 Ariz. 578, 581, 724 P.2d 1247, 1250 (App. 1986) (interpreting substantially similar predecessor statute). But the statute requires more than merely a best-interests analysis: it authorizes judicial limitation of a sole decision-maker's authority only when "the child's physical health would be endangered or the child's emotional development would be significantly impaired." A.R.S. § 25-410(A) ; see Egan v. Fridlund-Horne , 221 Ariz. 229, 239, ¶ 37, 211 P.3d 1213, 1223 (App. 2009) ("[W]e presume that when the legislature uses different wording within a statutory scheme, it intends to give a different meaning and consequence to that language."). The editors' comment to the uniform act underlying the statute makes clear that the heightened standard will be satisfied in only the most extreme of circumstances, and does not provide free license for the court to substitute its judgment for that of the decision-maker parent:
[I]n the absence of parental agreement, the court should not intervene solely because a choice made by the custodial parent is thought by the noncustodial parent (or by the judge) to be contrary to the child's best interest. To justify such an intervention, the judge must find that the custodial parent's decision would "endanger the child's physical health or significantly impair his emotional development"-a standard patently more onerous than the "best interest" test. The standard would leave to the custodial parent such decisions as whether the child should go to private or public school, whether the child should have music lessons, what church the child should attend. The court could intervene in the decision of grave behavioral or social problems such as refusal by a custodian to provide medical care for a sick child.[5]
Uniform Marriage & Divorce Act § 408, Comment (emphases added). Section 25-410(A) therefore applies only in extraordinary circumstances, consistent with the court's authority to "regulate the well-being of children and thus restrict the control of parents" if necessary to prevent "abuse or neglect." See Egan , 221 Ariz. at 234, ¶ 16, 211 P.3d at 1218. We further note that it would be the rare circumstance indeed (at least in a case with two fit parents) in which a parent who requires judicial intervention under § 25-410(A) would remain qualified to serve as the sole decision-maker under § 25-403.
¶ 28 Even if § 25-410(A) applied, it nowhere authorizes the court to appoint a treating professional for the child. The statute provides that the court may impose a "specific limitation of the ... sole legal decision-maker's authority." A.R.S. § 25-410(A) (emphasis added). An order prohibiting the decision-maker from withholding therapeutic care would be a limitation on decision-making authority. But an order requiring care by a specific provider is more than a limitation-it is a directive.
¶ 29 We further hold that ARFLP 95(A) cannot expand the court's statutory authority. ARFLP 95(A) provides that "[i]n addition to conciliation services, the court may order parties to engage in private mental health services, including, but not limited to, counseling, legal decision-making or parenting time evaluations, mental health evaluations, Parenting Coordinator services, therapeutic supervision of parenting time, and other therapeutic interventions." ARFLP 95(A) describes mental-health resources that the court may employ, with respect to parties, in aid of its decisions under the statutory scheme. It does not create a super-statutory power enabling the court to make legal decisions regarding a child's professional care.[6]
*423 See In re Marriage of Waldren , 217 Ariz. 173, 177, ¶¶ 20-21, 171 P.3d 1214, 1218 (2007) (holding that court-promulgated rules may address only procedural matters and may not abridge, enlarge, or modify substantive statutory rights even when exercising equitable powers); see also Foster v. Weir , 212 Ariz. 193, 195-96, ¶ 9, 129 P.3d 482, 484-85 (App. 2006) (holding that a procedural rule and statute dealing with same subject should be construed in harmony).
¶ 30 Here, the superior court erred as a matter of law by relying on § 25-410(A) to set "guidelines" for Father's exercise of sole legal decision-making. As an initial matter, the procedural prerequisites for § 25-410(A) were not present: the court was faced with a petition to modify legal decision-making, not a motion to limit sole legal decision-making. And § 25-410(A)'s substantive bar was not satisfied. This is not a case in which the parent awarded sole legal decision-making refused to secure necessary treatment for the child. In fact, long before the court's involvement, Father voluntarily secured therapy for L. and the therapy continued throughout the case, apparently to L.'s benefit. This is a case in which the parents agree that the child requires therapeutic intervention, but disagree about which therapeutic approach would be most beneficial. The court's imposition of "guidelines" to avoid "the potential for harm" posed by Father's exercise of sole legal decision-making reflects its legitimate concern that Father's view of L.'s situation may lead him to make less-than-ideal choices regarding L.'s care. The court made well-supported findings that Father "has been somewhat less willing to actively engage with [L.] on the gender identification issue," that his creation of the behavior-tracking log and his view that L. might be "in remission" suggest that "he may not be as open to allow exploration as the experts ... believe is appropriate," and that both his as well as Mother's "response[s] to [L.'s gender dysphoria ] has already caused [L.] emotional harm." But though the court was entitled to weigh such reasonable concerns when deciding how to allocate legal decision-making, it had no authority to ameliorate the concerns by managing Father's sole decision-making.
B. The Court's Appointment of Vigil Was Impermissible Because it Directed L.'s Therapy.
¶ 31 The court's appointment of Vigil was an order for therapy. Vigil was L.'s longstanding, privately retained counselor, and the court expressly ordered that she continue in that role. The court's attempt to characterize Vigil's appointment as one made under A.R.S. § 25-405(B) does not withstand scrutiny.
¶ 32 Section 25-405(B) provides that
[t]he court may seek the advice of professional personnel, whether or not employed by the court on a regular basis. The advice given shall be in writing and shall be made available by the court to counsel, on request, under such terms as the court determines. Counsel may examine as a witness any professional personnel consulted by the court, unless that right is waived.
Based on the plain language of the statute, the role of a professional appointed thereunder is strictly advisory. The statute serves "to permit the court to make custodial and visitation decisions as informally and non-contentiously as possible, based on as much relevant information as can be secured." Uniform Marriage & Divorce Act § 404(b), Comment (explaining identical provision in uniform act). Because the professional acts to aid the court only, he or she is entitled to judicial immunity. See Acevedo v. Pima Cty. Adult Probation Dep't , 142 Ariz. 319, 321, 690 P.2d 38, 40 (1984) (holding that judicial immunity "is granted to those who perform functions 'intimately related to,' or which amount to 'an integral part of the judicial process,' " and extends to "a non judicial officer who is delegated judicial duties in aid of the court," such as court-appointed psychiatrists (citations omitted) ); see also *424 Lavit v. Superior Court In and For County of Maricopa (Okken) , 173 Ariz. 96, 99-101, 839 P.2d 1141, 1144-46 (App. 1992) (holding that judicial immunity applied to psychologist who performed custody evaluation pursuant to stipulated order because psychologist performed court-ordered task). A treating therapist, by contrast, performs a nonjudicial function that does not justify immunity. See Awai v. Kotin , 872 P.2d 1332, 1336 (Colo. App. 1993) (holding that a court-appointed therapist's provision of "treatment, unlike reports or evaluations and recommendations, is not intimately related and essential to the judicial decision-making process" and is focused not on "aiding the court to separate truth from falsity" but "solely on the best interests of the patient," which creates a less compelling need for immunity). The court erred by conflating the roles of a therapist and a judicial advisor, and § 25-405(B) afforded it no authority to confer immunity.
C. The Court's Appointment of Ehrensaft Was Impermissible Because The Appointment Was Unrelated to Any Judicial Function.
¶ 33 With respect to Ehrensaft, the court's orders requiring that she provide input to the parties and Vigil as well as the court, for a duration tied to L.'s needs rather than the court's needs, appear to define a treating appointment. But we need not resolve any arguable ambiguity in Ehrensaft's role, because even if Ehrensaft was appointed in a wholly advisory capacity, the appointment was impermissible because it was not related to any issue pending before the court.[7] The court has no need for a professional's advice, and therefore no grounds to invoke § 25-405(A), when it has no issue to decide. To be sure, the court retains jurisdiction over legal decision-making and parenting-time matters. In re Marriage of Dorman , 198 Ariz. 298, 301, ¶ 7, 9 P.3d 329, 332 (App. 2000). And in many cases, as the court reasonably found here, the parties are "likely to remain in conflict." But in the absence of a pending motion or scheduled review hearing, the court has no grounds to invoke § 25-405(B).
D. The Court Could Not Award Attorney's Fees to Mother on Reasonableness Grounds, But The Award May be Justified Based Solely on the Parties' Disparate Financial Resources.
¶ 34 The court's award of attorney's fees to Mother for the post-trial disputes regarding Vigil and Ehrensaft's appointments was based on A.R.S. § 25-324(A). Section 25-324(A) provides that:
[t]he court from time to time after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings, may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceeding under ... chapter 4, article 1 of this title [regarding legal decision-making and parenting time].
¶ 35 The reasonableness of a party's position is evaluated by an objective standard. In re Marriage of Williams , 219 Ariz. 546, 548, ¶ 10, 200 P.3d 1043, 1045 (App. 2008). In view of our analysis in Sections I.A to I.C above, we cannot say that Father unreasonably opposed Vigil and Ehrensaft's appointments. But the court, in addition to finding unreasonableness, also stated that it might award fees based on the parties' respective financial positions. A disparity in income may support a fee award even when the party against whom fees are sought took a reasonable position. In re Marriage of Pownall , 197 Ariz. 577, 583, ¶ 29, 5 P.3d 911, 917 (App. 2000). We therefore vacate the fee award but remand so that the court may determine whether an award is justified based on financial disparity alone.
*425 II. THE COURT ERRED AS A MATTER OF LAW BY RESTRICTING MOTHER AND FATHER'S EXERCISE OF THEIR PARENTING TIME WITH L.
¶ 36 In addition to directing L.'s therapeutic care, the court imposed a number of limitations on Mother and Father's interactions with L.: the court prohibited them from speaking with L. about gender identification, and circumscribed their ability to provide L. with clothing, toys, and other items. To the extent that any of those restrictions could be construed as limits on legal decision-making, they were improper for the reasons set forth in Section I above. But we interpret the restrictions as applying to parenting time, not legal decision-making. Even when one parent has sole legal decision-making, the other parent, during his or her parenting time, "is responsible for providing the child with food, clothing and shelter and may make routine decisions concerning the child's care ." A.R.S. § 25-401(5) (emphasis added). "Parenting time" is therefore literally a time to engage in parenting.
¶ 37 The court may "restrict" parenting time only if "it finds that the parenting time would endanger seriously the child's physical, mental, moral or emotional health."[8] A.R.S. § 25-411(J) (emphasis added). That is a higher bar than best interests, though written findings are not required. Hart v. Hart , 220 Ariz. 183, 187-88, ¶¶ 16-19, 204 P.3d 441, 445-46 (App. 2009). But the statute is not an invitation for the court to interfere with constitutional rights. See Petolicchio v. Santa Cruz Cty. Fair & Rodeo Ass'n , 177 Ariz. 256, 259, 866 P.2d 1342, 1345 (1994) ("Arizona's courts do not reach constitutional issues if proper construction of a statute makes it unnecessary in determining the merits of the action."). The statute cannot be read to give the court broad license to infringe on a parent's right to care for his or her child, see Troxel , 530 U.S. at 67-68, 120 S.Ct. 2054, or to infringe on the parent's or the child's free speech, see Nash v. Nash , 232 Ariz. 473, 481-82, ¶ 32, 307 P.3d 40, 48-49 (App. 2013) (parenting-time restriction that constitutes prior restraint on speech valid only under strict scrutiny test); see also Goodman , 239 Ariz. at 115 n.2, ¶ 18, 366 P.3d at 592 n.2 (noting that "any order restraining speech is constitutionally suspect"). "The court's authority to impose 'restrict[ions]' on parenting time sua sponte under § 25-411(J) is limited to placing conditions on the exercise of parenting time, such as supervision or geographical restrictions," Cruz v. Garcia , 240 Ariz. 233, 238, ¶ 18, 377 P.3d 1028, 1033 (App. 2016), and the standard should be no different when restrictions are requested by a parent or recommended by a custody evaluator.
¶ 38 Here, even assuming that the court's findings were sufficient to support application of § 25-411(J), the parenting-time limitations that the court imposed far exceeded the statutory authority. The limitations constituted severe micromanagement of Mother and Father's parenting and significantly restrained both the parties' and L.'s speech.
CONCLUSION
¶ 39 For the reasons set forth above, we vacate the court's orders directing the exercise of Father's sole legal decision-making and the parents' parenting time. We also vacate the award of attorney's fees and costs to Mother, but we remand so that the court may determine whether the award is justified on financial-disparity grounds alone. We deny Father's request for attorney's fees and costs on appeal.

Though the order recited that the parties agreed to allow and aid the therapy, and not to elicit information from Vigil, the record belies the notion of consent.

In reality, Father already held sole legal decision-making with respect to the decisions for which the dissolution decree gave him final authority. See Nicaise v. Sundaram , --- Ariz. ----, ----, ¶¶ 18-19, ---P.3d ----, ---- (App. 2018). Father also does not challenge the court's requirement that he consult in good faith with Mother before making decisions. The court properly may require good-faith consultation when one parent is awarded sole authority. Id. at ---- n.3, ¶ 19, --- P.3d at ---- n.3.

Fit parents are those who (like both parents in this case) adequately care for their children. Troxel v. Granville , 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). Title 8, not Title 25, governs when parental fitness is at issue. Title 8 has no applicability here.

The term "custodial" refers to the same concept now known as "legal decision-making" in Arizona.

Mother contends that courts routinely appoint specific therapists under ARFLP 95(A). She cites Hays v. Gama , 205 Ariz. 99, 67 P.3d 695 (2003), DePasquale v. Superior Court (Thrasher) , 181 Ariz. 333, 890 P.2d 628 (App. 1995), and In re Maricopa Cty. Juv. Action No. JS-7499 , 163 Ariz. 153, 786 P.2d 1004 (App. 1989). We find those authorities inapposite. Hays , which involved the appointment of a therapist to provide counseling and recommendations in the context of an initial petition to establish custody, predated ARFLP 95(A). 205 Ariz. at 100-01, ¶¶ 2-13, 67 P.3d at 696-97; see ARFLP 95, Credits (effective January 1, 2006). Further, Hays assumed that the therapist was a properly appointed court advisor under A.R.S. §§ 25-405(B) and -406, and did not address the import or propriety of the therapist's second role as a treatment provider. Id. at 102, ¶ 15, 67 P.3d at 698. DePasquale , a custody modification case, involved a court-appointed psychologist tasked with providing recommendations to the court. 181 Ariz. at 334-35, 890 P.2d at 629-30. Finally, JS-7499 was a severance case governed by Title 8, not Title 25. See 163 Ariz. at 156-57, 786 P.2d at 1007-08.

We also need not address Father's contention that § 25-405(B) requires appointment of a professional who qualifies as an expert under Ariz. R. Evid. 702 and 706. Section 25-405(B) nowhere requires that the appointed professional qualify as an expert within the meaning of the rules of evidence. See Reilly v. United States , 863 F.2d 149, 154-55 (1st Cir. 1988) (holding that district court's inherent authority to appoint an expert as a technical advisor is not subject to Fed. R. Evid. 706's requirements for the "more exclusive class[ of] 'expert witnesses' "). And here, it is obvious that the court and parties' use of the term "gender expert" was nothing more than a colloquialism meant to describe a medical specialty. We further reject Father's suggestion that § 25-405(B) requires the court to outline specific appointment terms and obligations.

Similarly, the court may require supervised parenting time-which the court did not order here-only if the court "finds that in the absence of the [supervision] order the child's physical health would be endangered or the child's emotional development would be significantly impaired, and if the court finds that the best interests of the child would be served." A.R.S. § 25-410(B).