IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

─────────────

**PAUL E.,**
*Petitioner/Appellant,*


*v.*


**COURTNEY F.,**
*Respondent/Appellee.*


─────────────


No. CV-18-0111-PR
Filed April 25, 2019

─────────────

Appeal from the Superior Court in Maricopa County
The Honorable Joseph C. Kreamer, Judge
The Honorable Danielle Viola, Judge
No. FC2010-051045
**VACATED IN PART AND REMANDED**

Opinion of the Court of Appeals, Division One
244 Ariz. 46 (App. 2018)
**VACATED IN PART**

─────────────

COUNSEL:


Paul F. Eckstein (argued), Michael P. Berman, Perkins Coie, LLP, Phoenix;
Todd Franks, Robert C. Houser, Franks Law Offices, P.C., Phoenix,
Attorneys for Paul E.

Taylor C. Young (argued), Mandel Young PLC, Phoenix; Steven D.
Wolfson, Michelle N. Khazai, Dickinson Wright PLLC, Phoenix; Catherine
Sakimura, *Pro Hac Vice,* National Center for Lesbian Rights, San Francisco,
CA, Attorneys for Courtney F.

Helen R. Davis, The Cavanagh Law Firm, P.A., Phoenix; Annette T. Burns,
The Law Offices of Annette T. Burns, Phoenix, Attorneys for Amicus Curiae
American Academy of Matrimonial Lawyers – Arizona Chapter

─────────────

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES BOLICK, GOULD, LOPEZ, and PELANDER (RETIRED) joined.

JUSTICE TIMMER, opinion of the Court:

¶1　　　　When a family court designates one parent as the sole legal decision-maker for a child, unless the parties agree otherwise, the court may limit the decision-maker's authority only as necessary to prevent endangering the child's physical health or significantly impairing the child's emotional development. *See* A.R.S. § 25-410(A). We consider whether the family court exceeded its statutory authority by appointing specific treatment professionals for the child here and otherwise limiting the parent's sole legal decision-making authority. We hold that it did.

## BACKGROUND

¶2　　　　Paul E. ("Father") and Courtney F. ("Mother") have three children including L., who was born in 2007. Upon the parties' divorce in 2010, the family court awarded them joint legal decision-making authority with equal parenting time and, as relevant here, gave Father final legal decision-making authority concerning L.'s education and medical and dental care. Mother and Father have clashed on several parenting issues since their divorce, making their relationship, according to the family court, "volatile and dysfunctional." The dispute here stems from the parties' handling of L.'s gender identification.

¶3　　　　According to Mother, L., who is biologically male, displayed an early interest in toys and clothes generally associated with girls. Mother fostered this interest and attempted to socially transition L. to identifying as female without Father's knowledge or any professional consultation, with sometimes negative consequences. For example, in February 2013, Mother subjected then-five-year-old L. to ridicule by permitting L. to wear a skirt and other articles of "girl" attire to school on "free dress day" and asking the teacher to "encourage his classmates to accept him for who he is." According to Father, this incident was the first time he learned of L.'s interest in wearing skirts and the like. Father immediately sought professional assistance and, with Mother's agreement, he retained Diana Vigil, a licensed professional counselor, to counsel L. and advise the parties.

¶4          During the months following the "free dress day" incident, Father and Mother parented L. differently concerning gender identification issues. The parties agreed with Vigil that L. would explore wearing clothing and playing with toys typically associated with girls in Mother's home but nowhere else. They also agreed to only speak with L. about gender issues in a clinical environment. Although Father abided by the agreement, Mother did not. For example, she referred to L. with female pronouns and permitted L. to appear in public wearing clothes generally worn by girls. Mother also spoke with L. about matters beyond L.'s ability to comprehend, such as sex reassignment surgery and hormone therapy. Mother summed up the parties' situation in a September email to Father: "We definitely disagree about how to handle [L.'s] gender variance."

¶5          After Father learned that Mother would not follow Vigil's advice, he petitioned the family court in December 2013 to grant him sole legal decision-making authority concerning all three children. *See* A.R.S. § 25-411(A). As relevant here, he asserted that Mother "determined [L.] ha[d] gender dysphoria," despite having no such diagnosis, "insist[ed] the child . . . be treated as a girl, rather than as a boy, and ha[d] been . . . pushing such behavior on [L.]" At Father's request, the court immediately ordered Mother to temporarily remove girl-oriented toys from her house and refrain from, among other things, dressing L. in clothing generally worn by girls, referring to L. with feminine pronouns, and discussing gender-related issues with L. and the other children. Although the order applied only to Mother, Father also followed it. The parties and L. refer to these restrictions as "the Rule." The court also ordered diagnostic and custody evaluations and appointed a parenting coordinator.

¶6          Father's petition remained pending, and the Rule remained in effect, for more than two years as the evaluations occurred. Multiple medical professionals diagnosed L. with gender dysphoria of childhood, which refers to children with "a marked incongruence between the gender they have been assigned to (usually at birth, referred to as *natal gender*) and their experienced/expressed gender." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-5*) 453 (5th ed. 2013). These professionals disagreed, however, on how best to address the diagnosis with L.

¶7          Meanwhile, L. struggled under the Rule. L. repeatedly asked for the return of "girl's stuff," expressed anger over the Rule, and, under Mother's influence, blamed Father for its existence. One incident especially

illustrates L.'s distress. In February 2015, more than a year after implementation of the Rule, L. reportedly told Mother, "I want to die" and would do so by hanging. L. had purportedly made similar statements about dying to Mother in the preceding days. Mother took L. to the hospital, where L. expressed a desire to die due to the Rule. Fortunately, there were no signs of self-harm, and L. did not relate any incidences of self-harm. Hospital staff initially placed L. on a waiting list for inpatient psychiatric care but, after conducting a second evaluation outside Mother's presence, they discharged L. to Father. Based on the suicide threats and her concern that the Rule was harming L., Mother unsuccessfully moved the court to vacate the Rule.

¶8          As the trial date drew near, Dr. Paulette Selmi, a psychologist appointed as the custody evaluator, submitted a lengthy and comprehensive report. She concluded that joint legal decision-making would not be possible due to the parents' "high level of conflict" and recommended that one parent be given sole legal decision-making authority. She predicted that Father "[would] make the more rational and responsible decisions."

¶9          Despite the parents' conflicts, Dr. Selmi found L. to be "a delightful, funny, bright, articulate, and charming young person." L. excelled in academics, and teachers reported that L. is very friendly, has "a lot of friends and [is] happy," with no behavior problems. Similarly, Vigil, who had seen L. frequently for more than the preceding two years, described L. to Dr. Selmi as "remarkably resilient, funny, kind, brilliant, outgoing, [and] creative" and reported that L. "gets along well with classmates and is well-adjusted" in school. Dr. Selmi also found that L. has a "positive and close relationship[]" with both parents and is well-adjusted to home, school, and the community, although L. has been teased at school regarding gender identity.

¶10         Dr. Selmi made several recommendations regarding L.'s care. She suggested that Vigil continue to provide therapy to L. but refrain from advising the parties on co-parenting matters. Dr. Selmi stated that Vigil's therapy should be a "safe haven," meaning that what transpires in therapy would not be shared with the parents, absent L.'s agreement, or used in litigation. She also recommended that the court continue the Rule's "gag order" prohibiting Mother from discussing gender issues with L. and suggested the court consider extending the order to Father so that L. could explore gender identity without parental pressure. Finally, Dr. Selmi

recommended that a "physician gender specialist . . . follow [L.] along the way."

**¶11** The family court conducted a four-day trial in December 2015. The court accepted Father's agreement that if given sole legal decision-making authority, he would consult with Mother on all major decisions for the children. *See* A.R.S. § 25-401(6) ("'Sole legal decision-making' means one parent has the legal right and responsibility to make major decisions for a child."). Thereafter, the court designated Father as the sole legal decision-maker for all three children. *See* A.R.S. §§ 25-403(A), -403.01.

**¶12** Pursuant to § 25-410(A) and Arizona Rule of Family Law Procedure ("ARFLP") 95(A) (repealed 2018), and having L.'s "best interests" as its "primary consideration," the court implemented many of Dr. Selmi's recommendations as mandatory "guidelines," which are at issue here:

- A "gender expert" shall be appointed to provide input to the Court and guidance to the parties regarding gender identification issues.

  . . . .

- Diana Vigil will continue as [L.'s] therapist and will operate on a "safe haven" basis. She will consult with and work cooperatively with the gender expert.

  . . . .

- [The Rule] is vacated in part. The Rule is lifted as it relates to gender exploration by [L.] in Diana Vigil's office, Father's home and Mother's home. In all other places, it remains in effect. Neither parent shall discuss the lifting of [the Rule] with [L.], or permit gender exploration in their home until Diana Vigil discloses to [L.] that the order has been lifted.

- Although [L.] will be free to explore in each parent's house, neither parent shall discuss gender identification issues with L. The parties should utilize a standard response as suggested by Dr. Selmi if [L.] asks to talk about gender identification issues, deferring the question or discussion to

Diana Vigil. No person other than the gender expert (and his or her designee) and Diana Vigil shall discuss gender identification/exploration with [L.] The Court is open to allowing the parents to discuss gender identification issues in the future should such an approach be suggested by the gender expert.

- Neither parent may, directly or indirectly, promote or discourage a specific view of gender identification for [L.]

After seeking input from the parties about who should serve as the gender expert, the court appointed Dr. Diane Ehrensaft to serve in that role.

¶13 Following post-trial motions, the court clarified that Vigil would serve as a court-appointed expert to provide therapy for L. and to advise the court pursuant to A.R.S. § 25-405(B). It further ordered that no other clinician could evaluate or treat L. without Vigil's permission or court order. It also ruled that neither party could have access to Vigil's records and that Vigil could "determine when and if to share or discuss an issue with the parents." The court authorized Vigil to confer with L.'s teachers and child care providers and examine L.'s school and medical records. The court stated that its order "act[ed] as a release by the parents" of all privileged information concerning L. and directed them to provide any releases requested by Vigil to obtain information. Finally, it stated that both Vigil and Dr. Ehrensaft would be "cloaked with applicable judicial immunity."

¶14 The court of appeals vacated the family court's orders to the extent they infringed on Father's exercise of his sole legal decision-making authority concerning L. *Paul E. v. Courtney F.*, 244 Ariz. 46, 48 ¶ 1 (App. 2018). Specifically, the court held that the family court lacked authority to choose L.'s therapists, to order the parties to refrain from making certain parenting choices (including discussing sensitive topics with L.), or to confer judicial immunity on the appointed therapists. *Id.* The court also vacated an attorney fee award against Father and remanded for a re-determination of Mother's fee request. *Id.*

¶15 We granted review to decide whether the family court was authorized to appoint a specific treating therapist for L. (Vigil) and a consulting expert for the court and parties (Dr. Ehrensaft), with attendant restraints on Father's authority, all issues of statewide importance. We

have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

**I.      A.R.S. § 25-410(A)**

¶16         Once appointed as sole legal decision-maker for L., Father alone possessed the "legal right and responsibility to make major decisions" for L., including non-emergency health care and personal care decisions.   § 25-401(3), (6); *Nicaise v. Sundaram* (*Nicaise II*), 245 Ariz. 566, 569 ¶ 14 (2019) ("[A]n award of sole legal decision-making . . . creates unshared authority.").  Section 25-410(A) authorized the family court to limit Father's authority in narrow circumstances:

> Except as otherwise agreed by the parties in writing at the time of the legal decision-making or parenting time order or divorce decree, the parent designated as sole legal decision-maker may determine the child's upbringing, including the child's education, care, health care and religious training, unless, on motion by the other parent, the court, after a hearing, finds that in the absence of a specific limitation of the parent designated as the sole legal decision-maker's authority, the child's physical health would be endangered or the child's emotional development would be significantly impaired.

The issue here is whether the court's appointments of Vigil and Dr. Ehrensaft, including the broad authority granted to them, are permissible "specific limitation[s]" on Father's authority.

¶17         Before addressing the merits, we quickly dispense with Father's argument that the family court lacked authority to limit his authority under § 25-410(A) because Mother had not filed a motion seeking a limitation.  Father did not object to the lack of a motion before the family court or the court of appeals, although the latter court addressed it.  *See Paul E.*, 244 Ariz. at 56 ¶ 30 ("[T]he procedural prerequisites for § 25-410(A) were not present: the court was faced with a petition to modify legal decision-making, not a motion to limit sole legal decision-making.").  The family court's error in proceeding absent a motion or the parties' agreement was not preserved and is not before us.  *See N. Valley Emergency Specialists, L.L.C.*

*v. Santana*, 208 Ariz. 301, 302 ¶ 6 n.2 (2004) (finding issue not raised by party in either the trial court or court of appeals waived).

**¶18** On the merits, resolution of the issue here turns on the meaning of § 25-410(A). We interpret the provision de novo with the aim of effectuating the legislature's intent. *Ryan v. Napier*, 245 Ariz. 54, 64 ¶ 41 (2018). If § 25-410(A) has only one reasonable meaning, we will apply that meaning without further analysis. *Id.* "If the statute is subject to more than one reasonable interpretation, however, we will resolve that ambiguity by examining other factors like the context of the statute, the language used, the subject matter, its historical background, its effects and consequences, and its spirit and purpose." *Id.* (internal quotation marks omitted).

**¶19** The court of appeals concluded that a "specific limitation" under § 25-410(A) allows a family court to prohibit the sole legal decision-maker from making decisions like withholding therapeutic care for a child but does not authorize the court to issue "directive[s]" like requiring care by a specific provider. *See Paul E.*, 244 Ariz. at 55 ¶ 28. Father adds that giving "specific limitation" the broad meaning ascribed to it by the family court would effectively eliminate his statutory rights as sole legal decision-maker and infringe on his fundamental right to parent L. Mother counters that the plain meanings of "limitation" and "authority" permit the court to direct a child's care in any manner necessary to protect the child's physical and emotional health. She also argues that a sole legal decision-maker's fundamental right to parent is not violated because the limitation can only be imposed to protect a child from harm, which is a compelling state interest.

**¶20** The term "specific limitation" is not statutorily defined. Reading the term in its proper context within § 25-410(A) indicates it creates a narrow exception to the broad authority conferred on the sole legal decision-maker. *See BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 21 ¶ 19 (2018) ("We must not interpret terms in isolation, but rather in their overall context."). The statute requires more than just a showing that a limitation on the sole legal decision-maker's authority would be in the child's best interests. *Cf.* § 25-403(A) (requiring the family court to consider best interests in deciding whether to award joint legal decision-making authority or sole legal decision-making authority). Rather, the court may limit the sole legal decision-maker's authority only if "the child's physical health would be endangered or the child's emotional development would be significantly impaired," circumstances that presumably would occur

infrequently with a fit parent making decisions. § 25-410(A). Also, any finding of endangerment or significant emotional impairment must spring from "the absence of a specific limitation." *Id.* It follows that a permissible "specific limitation" must have a nexus with the required finding. And use of the term "specific" suggests that any ordered limitation must avert endangerment or impairment without unnecessarily infringing on the sole legal decision-maker's authority, which is broad and unshared. *See Nicaise II*, 245 Ariz. at 569 ¶ 14.

**¶21** Section 408 of the Uniform Marriage and Divorce Act ("UMDA"), which the Arizona legislature adopted as § 25-410(A), also supports a conclusion that the family court's ability to infringe on a sole legal decision-maker's authority is restrained. *See UNUM Life Ins. Co. of Am. v. Craig*, 200 Ariz. 327, 332 ¶ 25 (2001) ("[W]e assume that the legislature intended to adopt the construction placed on the [Uniform] act by its drafters." (internal quotation marks omitted)). The comment to § 408 states that this provision is designed to "promote family privacy and to prevent intrusions upon the prerogatives of the [sole legal decision-maker]" at the other parent's request. *See* UMDA § 408 cmt.; *see also Craig*, 200 Ariz. at 332 ¶ 25 ("Commentary to such a uniform act is highly persuasive unless erroneous or contrary to the settled policy of Arizona."). It recognizes that the parent with sole legal decision-making authority is generally "responsible for post-divorce decisions concerning the upbringing of the child" and cautions against court intervention unless it is to enforce a written agreement between the parents or to prevent endangering the child:

> [I]n the absence of parental agreement, the court should not intervene solely because a choice made by the [sole legal decision-maker] is thought by the [other] parent (or by the judge) to be contrary to the child's best interest. To justify such an intervention, the judge must find that the [sole legal decision-maker's] decision would "endanger the child's physical health or significantly impair his emotional development"—a standard patently more onerous than the "best interest" test. The standard would leave to the [sole legal decision-maker] such decisions as whether the child should go to private or public school, whether the child should have music lessons, what church the child should attend. The court could intervene in the decision of grave behavioral or social problems such as refusal by a custodian to provide medical care for a sick child.

UMDA § 408 cmt.

**¶22** Interpreting § 25-410(A) as authorizing the court to impose a specific limitation on a sole legal decision-maker's authority that does no more than prevent either endangering the child's physical health or significantly impairing the child's emotional development also accommodates "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" under the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion); *see also* A.R.S. § 1-601 (recognizing that "[t]he liberty of parents to direct the upbringing, education, health care and mental health of their children is a fundamental right" that "shall not [be] infringe[d] on" absent a compelling governmental interest "of the highest order" and only when such infringement "is narrowly tailored and is not otherwise served by a less restrictive means").

**¶23** Although we agree with the court of appeals that § 25-410(A) has narrow application, we disagree with aspects of the court's interpretation. First, a "specific limitation" does not have to be a "prohibit[ion]" rather than a "directive." *Paul E.*, 244 Ariz. at 55 ¶ 28. A "limitation" is a "restriction or restraint." Black's Law Dictionary 1069 (10th ed. 2014) (defining "limit" as a "restriction or restraint" and "limitation" as "[t]he act of limiting"); *see also DBT Yuma, L.L.C. v. Yuma Cty. Airport Auth.*, 238 Ariz. 394, 396 ¶ 9 (2015) ("Absent statutory definitions, courts generally give words their ordinary meaning and may look to dictionary definitions." (internal citation omitted)). Just as a prohibition restricts and restrains a sole legal decision-maker's authority, so does a directive. The key to complying with § 25-410(A) is that the limitation, in either form, must be necessary to prevent the child's physical endangerment or significant emotional impairment.

**¶24** The court of appeals apparently was persuaded that a "directive" is impermissible because the family court "has no say in the actual decisions of the chosen parent" and "typically [may] do no more than reallocate the authority between the parents" when they disagree. *Paul E.*, 244 Ariz. at 54 ¶ 26; *see also id.* ¶ 25 ("[T]he [family] court's statutorily prescribed role is not to make decisions in place of parents, but to decide which fit parent or parents shall make such decisions." (quoting *Nicaise v. Sundaram* (*Nicaise I*), 244 Ariz. 272, 280 ¶ 27 (App. 2018), *vacated in part on other grounds*, *Nicaise II*, 245 Ariz. 566)). This is not so.

¶25        The family court is authorized to make childrearing decisions in limited, statutorily prescribed circumstances.  For example, the court may grant third-party-visitation rights over a parent's objection if "visitation is in the child's best interests."  A.R.S. § 25-409(C); *In re Marriage of Friedman & Roels*, 244 Ariz. 111, 113 ¶ 1 (2018) (holding that "when two legal parents disagree about whether visitation is in their child's best interests, both parents' opinions are entitled to special weight" but "parents' conflicting opinions must give way to the court's finding on whether visitation is in the child's best interests").

¶26        The court is also authorized to intervene when parents cannot agree on childrearing decisions to be included in a parenting plan.  *See* A.R.S. § 25-403.02(C)(2) (permitting a parenting plan to address any issue and requiring a description of "[e]ach parent's rights and responsibilities for the personal care of the child and for decisions in areas such as education, health care and religious training").  When an impasse occurs, the court is authorized to determine not only the parenting plan element in dispute, but also "other factors that are necessary to promote and protect the emotional and physical health of the child."  § 25-403.02(D); *see also Jordan v. Rea*, 221 Ariz. 581, 589 ¶¶ 19–20 (App. 2009) (concluding that former, identical version of § 25-403.02(D) authorized the family court to apply best-interests standard to resolve parents' disagreement about which school children should attend).

¶27        In *Nicaise I*, the court of appeals stated that § 25-403.02(D) did not authorize the family court to make parental decisions when the parties disagreed, as occurred in *Jordan*, as doing so would "render the concept of sole legal decision-making meaningless."  *Nicaise I*, 244 Ariz. at 281 ¶ 29 n.6.  But that statute applies when both parents are entitled to make certain decisions and thus need to agree, which is not typically the situation when one parent is the sole legal decision-maker.  *See* § 25-403.02(D) (authorizing court intervention "[i]f the parents are unable to agree").  Thus, if the court awards joint legal decision-making authority, the court is authorized to resolve any conflict.  The court is not limited to merely vesting one parent with sole legal decision-making authority on the disputed issue, and we disapprove of the contrary view in *Nicaise I*.  *See Nicaise I*, 244 Ariz. at 280–81 ¶¶ 27–30.  In contrast, when, as here, the family court has awarded sole legal decision-making authority to a parent, if the other parent disagrees with the sole legal decision-maker on a major issue, the court may only intervene as authorized in § 25-410(A).

11

¶28 We also disagree with the court of appeals that endangerment and significant emotional impairment, as used in § 25-410(A), means abuse or neglect, which implies wrongdoing. *See Paul E.*, 244 Ariz. at 55 ¶ 27 (stating § 25-410(A) applies only when a specific limitation is "necessary to prevent abuse or neglect" (internal quotation marks omitted)). Although the legislature defined "abuse" and "neglect" for statutes addressing child safety, *see* A.R.S. § 8-201(2), (25), which are inapplicable here, nothing in § 25-410(A) suggests any intent to import these terms. Also, the case relied on by the court of appeals did not address § 25-410(A). *See Egan v. Fridlund-Horne*, 221 Ariz. 229, 234 ¶ 16 (App. 2009) ("States may regulate the well-being of children and thus restrict the control of parents in a number of areas, including . . . prevention of abuse or neglect.").

¶29 In sum, § 25-410(A) authorizes the family court to impose a specific limitation on the sole legal decision-maker's authority only when the other parent demonstrates that absent that limitation, the child would be physically endangered or the child's emotional development would be significantly impaired. This provision will be triggered most often after the sole legal decision-maker has either actually exercised authority or has indicated he or she would do so in a way that would harm the child. For example, refusing to retain particular therapeutic services could justify an order requiring such services if refraining from doing so would endanger the child's physical health or significantly impair the child's emotional development. The limitation imposed can be a prohibition or a directive. But any limitation must be tailored to prevent or remedy the endangerment or impairment. The court must be mindful not to unnecessarily intrude on the sole legal decision-maker's unshared authority to make major decisions concerning the child's upbringing, even if those decisions conflict with expert opinion or the court's own views on childrearing.

¶30 As for the orders here, the family court found that "Father's approach [to gender dysphoria issues] [w]as generally reasonable" and he "appropriately sought out therapy for [L.] and followed the therapist's advice" before issuance of the Rule. But Father's failure to "actively encourage gender exploration in his home" before the Rule, maintenance of a log documenting events bearing on L.'s gender identification, and "view that [L.] might be 'in remission' during 2015" indicated "he may not be as open to allow exploration as the experts . . . believe is appropriate." Addressing § 25-410(A), the court found that "[L.'s] gender dysphoria diagnosis and the parents' response to it has already caused [L.] emotional harm" and "[w]hile Father may argue that Mother[]" mainly inflicted that

12

harm, "Father was slow to accept the diagnosis, and has advocated a position that [L.] was in 'remission'—a position at odds with the experts." Thus, given the "complexity of [L.'s] situation, the dynamics of the parties' relationship and the potential for harm if it is not managed correctly," the court found that L.'s "physical health would be endangered and emotional development impaired" if the court did not "establish some [mandatory] guidelines for the parents in addressing [L.'s] situation."

¶31        This order does not satisfy § 25-410(A) because it fails to focus on how Father's exercise of unchecked legal decision-making authority would place L. at risk for physical injury or significantly impair L.'s emotional development. The complexity of L.'s situation is not a basis alone for invoking § 25-410(A). Fit parents, like Father, frequently guide their children through complex situations without court interference. The "dynamics of the parties' relationship" does not suggest that Father will exercise his sole legal decision-making authority in a way that endangers or impairs L. And the potential for harm due to mismanaging the gender dysphoria diagnosis is not equivalent to finding that absent a specific limitation, L. would be put at risk for harm or suffer harm. *See* § 25-410(A).

¶32        Mother has not pointed to any evidence, and we have not found any, supporting a finding that absent the mandatory "guidelines" imposed by the court, Father's exercise of decision-making authority would physically endanger L. or significantly impair L.'s emotional development. Father's past reluctance to accept L.'s diagnosis does not demonstrate he would fail to appropriately address that diagnosis in the future. Indeed, he has meaningfully addressed the diagnosis, and the evidence suggests he will continue to do so. For example, Father originally retained Vigil's services, maintained them throughout the court proceedings, followed her advice, and said he would both continue to pursue therapy for L. with Vigil or a future therapist and retain a gender expert. Before the court, Father expressed a willingness to allow L. to fully explore gender issues in his home and agreed with Dr. Selmi's recommendation that Father see a therapist to acquire "psycho-educational approaches to learning about gender issues."

¶33        None of the expert evidence supports a finding that Father's exercise of sole legal decision-making authority, absent the mandatory "guidelines" here, would harm L. According to Vigil, although Father was initially uncomfortable with L.'s gender dysphoria diagnosis, he came to be "more accepting" of it. Dr. Selmi reported she "never viewed Father as an

individual who will reject [L.] if [L.] decides to be a transfemale, gay, or straight, or something else." Although Dr. Selmi recommended many of the directives that comprised the court's appointment orders, she did not state that the failure to implement them would endanger or impair L. She also did not express doubt about Father's ability to make decisions concerning L.'s gender dysphoria. Indeed, she implicitly found Father's parenting skills sufficient, as she noted that Father has a "positive and close relationship[]" with L., who is "well adjusted," and predicted that "Father will make the more rational and reasonable decisions" when making parenting decisions.

¶34 Even if the evidence showed that absent a specific limitation on Father's authority L. would be physically endangered or his emotional development would be significantly impaired, the family court failed to tailor each directive to prevent such harm. A hypothetical illustrates our point. If the evidence showed that L. would be placed at risk for physical danger or significantly impaired emotionally if Father chose not to maintain therapy for L. or consult with a gender expert, the court could compel therapy and consultation. But absent evidence demonstrating that Father would choose an unqualified or ineffective therapist or gender expert, § 25-410(A) did not authorize the court to select a specific therapist and expert.

¶35 In short, although the court had concerns about Father's ability to successfully guide L. through gender dysphoria, Mother failed to show that Father's exercise of his sole legal decision-making authority would place L. at risk for physical injury or significantly impair L.'s emotional development without the court's appointment of specific treating professionals and attendant restrictions on Father's authority. Absent such evidence, § 25-410(A) did not authorize the court's appointment orders. The evidence supports findings implicit in the court's orders, however, that L. would be physically endangered or suffer significant emotional impairment if Father fails to maintain therapy for L. or retain a gender expert or if he declines to allow L. to gender explore. On remand, if the court makes any or all these findings, it may order Father to continue L.'s therapy, retain a gender expert, and/or permit L. to gender explore. *See* § 25-410(A).

## II.    A.R.S. § 25-405(B)

¶36        Mother alternately argues that § 25-405(B) authorized the family court to appoint Vigil and Dr. Ehrensaft as "consulting experts." Section 25-405(B) provides that "[t]he court may seek the advice of professional personnel" to determine legal decision-making authority and parenting time. *See also Hays v. Gama*, 205 Ariz. 99, 102 ¶ 15 (2003). We agree with the court of appeals that § 25-405(B) did not authorize the family court to appoint Vigil and Dr. Ehrensaft. *See Paul E.*, 244 Ariz. at 56–57 ¶¶ 31–33.

¶37        First, § 25-405(B) applies only when an issue regarding legal decision-making authority or parenting time is pending before the court. *See* UMDA § 404(b) cmt. (explaining that this provision, which is identical to § 25-405(B), "[is] designed to permit the court to make [legal decision-making] and [parenting time] decisions as informally and non-contentiously as possible"). Here, no such issues were pending, as the court had already awarded Father sole legal decision-making authority and parenting time was no longer in dispute. In other words, the court did not need professional advice to make legal decision-making or parenting time decisions because it had already made those decisions.

¶38        Second, even if a legal decision-making or parenting time issue had been pending, the court's appointment of Vigil and Dr. Ehrensaft exceeded the authority granted by § 25-405(B). That provision only authorizes the court to seek advice from a professional to aid it in making certain decisions. Section 25-405(B) nowhere authorizes the court to order treatment for a child, as occurred here.

## III.    ARFLP 95(A)

¶39        Mother finally argues that ARFLP 95(A) authorized the family court to appoint Vigil and Dr. Ehrensaft. The version of ARFLP 95(A) in effect at the time of the court's orders provided that "[i]n addition to conciliation services, the court may order parties to engage in private mental health services, including, but not limited to, counseling, legal decision-making or parenting time evaluations, mental health evaluations, Parenting Coordinator services, therapeutic supervision of parenting time, and other therapeutic interventions."

¶40 We agree with the court of appeals that ARFLP 95(A) did not authorize the appointment orders here. *See Paul E.*, 244 Ariz. at 55–56 ¶ 29. ARFLP 95(A) is a procedural rule and cannot enlarge the court's authority beyond that granted by statute. *See In re Marriage of Waldren*, 217 Ariz. 173, 177 ¶¶ 20–21 (2007) (stating that a court rule "may address only procedural matters" and cannot "abridge, enlarge or modify substantive rights of a litigant" (quoting A.R.S. § 12-109(A))). As previously explained, the court's appointment orders infringed on Father's sole legal decision-making authority under §§ 25-401(3), (6) and -403, and a statutory exception did not apply. ARFLP 95(A) does not apply here.

## CONCLUSION

¶41 We vacate the court of appeals' opinion except for ¶¶ 34–35 and 39. We vacate the family court's orders entered March 23, March 31, June 10, and June 13, 2016, to the extent those orders appointed and granted authority to Vigil and Dr. Ehrensaft and limited Father's sole legal decision-making authority. We remand the case to the family court to determine the attorney fee award as directed by the court of appeals and for further proceedings consistent with this opinion.