NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO B.T.

No. 1 CA-JV 24-0028
FILED 07-16-2024

---

Appeal from the Superior Court in Maricopa County
No. JS19712
The Honorable Christopher Whitten, Judge

**AFFIRMED**

---

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Cox Sandoval Law PLLC, Chandler
By Annette Cox Sandoval
*Counsel for Appellee Ryan T.*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellee B.T.*

---

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding Judge Jennifer B. Campbell and Judge Kent E. Cattani joined.

---

**M c M U R D I E**, Judge:

**¶1**　　　　Shelby Kohlhofer ("Mother") appeals from an order terminating her parental rights. She argues that the juvenile court could not find she abandoned her daughter when the other parent's interference caused her lack of visitation. We find no error and affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**　　　　Mother and Ryan Tramel ("Father") are the biological parents of Brenda,[1] born in August 2011. Mother cared for Brenda during the first three and a half years of her life. Mother and Brenda also resided with Mother's parents ("Grandparents") for some of that time. Although Father visited the hospital at Brenda's birth and provided diapers and formula on at least one occasion, he did not otherwise support Brenda. Instead, Father and Mother fell out of contact, and Father testified that he "just kind of gave up" and "figured it was probably someone else's child."

**¶3**　　　　In May 2015, the Department of Child Safety ("Department") filed a dependency petition alleging neglect by Mother and Father. The Department alleged that Mother had "issues with alcohol" and that family members reported she drank on a "daily basis," sometimes before driving. The Department alleged that Father had not established paternity nor "had any contact with his child since she was two weeks old" and thus had "abandoned the child." The Department took temporary custody of Brenda and placed her with Grandparents.

**¶4**　　　　Mother failed to appear at the dependency hearing, and the court adjudicated Brenda dependent as to her. But Father contested the dependency and requested a paternity test, which showed he was the father. Father coordinated with the Department and Grandparents to become acquainted with Brenda through visits, and the Department

---

[1]　　　We use a pseudonym to protect the child's identity.

recommended dismissing the dependency because Father had "demonstrated that he [could] safely parent his daughter." In a 2016 temporary order, the juvenile court awarded Father physical custody and legal decision-making authority for Brenda. The court also ordered that Mother have visitations supervised by Grandparents and that Father inform Mother of "any significant events" related to Brenda. The court included similar terms in its final judgment in September 2016.

¶5　　　　Mother's struggles with alcohol continued. Mother was convicted of an aggravated DUI offense in November 2016 and again in February 2017. She was incarcerated throughout 2017. Shortly after her release in 2018, she was incarcerated again for six months for a probation violation.

¶6　　　　In August 2018, Father petitioned to terminate Mother's parental rights. It is unclear under what statutory grounds Father based his petition. In any event, Father agreed to dismiss the petition after Mother and Father attended mediation. The parents then stipulated to a visitation schedule. The juvenile court dismissed the termination petition and adopted the stipulated schedule.

¶7　　　　The stipulated schedule provided that Grandparents would spend at least "4 hours on a Saturday or Sunday" each month with Brenda and that the parties would "make best efforts" to accommodate visitation during holidays. The schedule authorized Mother to visit Brenda during Grandparents' visitation but directed that Father "be provided information regarding the details of [visits] with mother." Finally, the agreement provided multiple "conditions," including that "Mother [had to] abide by all conditions of her parole" and that "[i]f Mother fail[ed] to demonstrate sobriety her visitations [could] be reduced and/or canceled."

¶8　　　　In October 2019, Mother was arrested for driving under the influence of alcohol while on probation for a previous DUI, with a 15-year-old child in the car. She was convicted of aggravated DUI and sentenced to six years in prison.

¶9　　　　Despite Mother's incarceration, Grandparents continued to allow contact between Mother and Brenda through letters and phone calls. But in a 2020 email, Father stated: "[W]e do not want any letters being received or sent to or from [Brenda]." Father repeated this position in later emails over the years and threatened to withhold Grandparents' visitation if they allowed Brenda contact with Mother.

**¶10**　　　　In July 2023, Father filed a second termination petition against Mother alleging abandonment, chronic substance abuse, and felony length-of-sentence grounds. *See* A.R.S. § 8-533(B)(1), (3), (4). In February 2024, the juvenile court held a contested severance hearing.

**¶11**　　　　At the hearing, Mother testified that she sent four letters to Father while in prison "to ask about visitation and grades and school pictures." But Father testified that Mother never asked if she could send letters to him, Brenda through him, or Grandparents. He stated he received one letter from Mother, delivered through Grandparents, asking Father's consent to allow Brenda to visit her at the prison. The juvenile court found that Mother's testimony about her attempted contact with Father "[was] not persuasive." And Mother admitted she could not call Father because she did not have prison approval.

**¶12**　　　　Mother also testified that she wrote to Brenda "two to three times a month" and would send cards and gifts while in prison. Brenda's grandmother testified that Mother wrote letters "on, probably, a monthly basis," but Mother only produced one card and no more than four letters per year as evidence. The juvenile court did not resolve the credibility of these conflicting statements.

**¶13**　　　　Father admitted that he "put[] the kibosh on . . . letters and contact" between Brenda and Mother by forbidding Grandparents from facilitating contact. And he admitted that he was not "open to having [Mother] call [Brenda] at [his] house" during her most recent incarceration. But he also explained that he would have been "more amenable to phone contact" if Mother had "demonstrate[d] sobriety" by providing test results "and things of that nature."

**¶14**　　　　After the hearing, the juvenile court denied termination under the substance abuse and length-of-sentence grounds, finding that Father did not meet "his burden of proving the elements . . . by clear and convincing evidence." But it granted severance on the abandonment ground. The court explained:

> There is no evidence that Mother made efforts to have visitation with [Brenda] during her various times in custody. . . . Mother argues that part of the reason she has not spent more time with [Brenda] during the various times she has been incarcerated is that Father has interfered with her doing so. Indeed, Father has indicated he might not have agreed to such contact absent some demonstration of

4

Mother's sobriety. But Mother never sought his agreement. If she had done so, and Father had unreasonably withheld his cooperation, Mother could have asked a Court to order requiring the same. She has never done so.

The court then distinguished this case from *Calvin B. v. Brittany B.*, 232 Ariz. 292 (App. 2013). It concluded that "Father's actions do not rise to the level of interference required to establish a defense to abandonment." *Cf. id.* at 297-99, ¶¶ 21-33. Finally, the court found that the termination of Mother's parental rights was in Brenda's best interests.

¶15        Mother appealed. This court has jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

¶16        We will affirm a termination order unless the juvenile court abused its discretion or its factual findings were clearly erroneous. *See Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, [and] judge the credibility of witnesses." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We accept the juvenile court's factual findings unless no reasonable evidence supports them. *Id.* We do not reweigh the evidence. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

¶17        The juvenile court granted severance on the abandonment ground. *See* A.R.S. § 8-533(B)(1). Under A.R.S. § 8-531(1),

> 'Abandonment' means the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

¶18        Mother does not challenge the juvenile court's factual findings or its conclusion that severance would be in Brenda's best interests. Instead, she emphasizes that her "'conduct' must be evaluated in light of 'the [parent]'s ability to perform [her or his] parental obligations.'" *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249-50, ¶¶ 18, 21-22 (2000). She argues that the juvenile court abused its discretion by terminating her

rights on the abandonment ground when Father's interference was to blame for Mother's lack of contact with Brenda.

**¶19** Mother cites *Calvin B.* in support of her position. *See* 232 Ariz. 292. In *Calvin B.*, the mother obtained protective orders against the father, at least one of which included their son as a protected person. *Id.* at 294, ¶¶ 3, 7. But the father continued to seek visitation through messages to the mother's family and was arrested twice for texting the mother directly to ask to see their son. *Id.* at 295, ¶ 8. Before the expiration of the second order of protection, the mother petitioned to terminate the father's rights, alleging abandonment. *Id.* at ¶ 9. The father responded with a request for temporary orders seeking parenting time and petitioned to enforce parenting time. *Id.* at ¶¶ 9-10. The parties agreed to continue the severance trial to allow the father supervised visitation, but the court required the indigent father to pay the visitation costs. *Id.* at ¶ 12. The father attended some supervised visits but could not pay for the cost of other opportunities. *Id.* at ¶ 13. Meanwhile, the mother prevented the father from speaking to their son over the phone and canceled two scheduled visits. *Id.* at 295-96, ¶ 14. The court ultimately terminated the father's rights on the abandonment ground. *Id.* at 296, ¶ 15.

**¶20** This court reversed the termination. *Calvin B.*, 232 Ariz. at 299, ¶ 33. We reasoned,

> [F]or much of the period after the dissolution . . . [mother] interfered with [father's] opportunity and ability to develop a normal parental relationship with their son. A parent may not restrict the other parent from interacting with their child and then petition to terminate the latter's rights for abandonment.

*Id.* at 297, ¶ 21. We noted that the father "actively sought more involvement with their son than [the mother] would allow," and although "no one would suggest [the father] was a salutary parent," we lauded his efforts in successfully "manag[ing] as many as ten visits with his son a year," especially "given the hurdles that [the mother] erected." *Id.* at ¶¶ 22, 25.

**¶21** Mother argues her case is like *Calvin B.* because Father's unilateral visitation elimination prevented her from contacting Brenda. She concludes that the lack of relationship necessary for an abandonment claim stemmed from Father's conduct, not hers.

**¶22** But this case is distinguishable from *Calvin B.* Here, the juvenile court found that Mother had not shown that she "actively sought more involvement . . . than [Father] would allow." *See Calvin B.*, 232 Ariz.

at 297, ¶ 22. Mother had not managed ten visits—or even demonstrated that she had sent ten letters—within any of the years of her incarceration. *Cf. id.* at ¶ 25.

**¶23**        Most importantly, the father in *Calvin B.* "'vigorously assert[ed] his legal rights' to see his son" by petitioning the court to enforce the standing visitation orders and for modification several times. *See Calvin B.*, 232 Ariz. at 294-95, 298, ¶¶ 3, 5, 9, 29 (quoting *Michael J.*, 196 Ariz. at 250, ¶ 22). By contrast, here, in the years of her incarceration, Mother did not once ask the court to enforce visitation under the stipulated orders. *See Paul E. v. Courtney F.*, 246 Ariz. 388, 395, ¶ 27 (2019) (When the family court has awarded sole legal decision-making authority to a parent and the other parent disagrees with the sole legal decision-maker on a major issue, the court may intervene.). Nor did she petition to modify the stipulated orders, under which Father held the legal power to suspend visitation. *See In re C.R.*, 256 Ariz. 170, 174, ¶ 15 (App. 2023) (The court held that *Calvin B.* only applies "if the parent *wrongfully* restricts the other parent's access to the child.").

**¶24**        Mother wanted to visit Brenda and was hampered by Father's unilateral power to deny contact under the stipulated parenting plan. But "abandonment is measured not by a parent's subjective intent, but by the parent's conduct," *Michael J.*, 196 Ariz. at 249, ¶ 18. Here, Mother's conduct led to her incarceration, and she took no formal steps to assert her rights during the years of her incarceration. The juvenile court did not abuse its discretion by finding that Mother abandoned Brenda.

**CONCLUSION**

**¶25**        We affirm.

